By:

Joanne Doddy Fort

Dated: December 2, 1999

All members of the Board concur in this Report and Recommendation.

## In re M.A.C., Appellant.

### No. 96–FS–19.

District of Columbia Court of Appeals.

Argued Feb. 24, 1999.
Decided Oct. 27, 2000.

Robert S. Becker, was appointed by the court, Washington, DC, for appellant.

Sidney R. Bixler, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, Robert R. Rigsby, and Rosalyn Calbert Groce, Director, Policy and Appeals Branch, were on the brief, for appellee.

Before WAGNER, Chief Judge, and RUIZ, Associate Judge, and PRYOR, Senior Judge.

WAGNER, Chief Judge:

Appellant, M.A.C., appeals from an adjudication of delinquency based upon the trial court's finding that he was guilty of first degree murder. M.A.C., who was fifteen-years-old at the time of the offense and his arrest, contends that the trial court erred in denying his motion to suppress his confession. He contends that, because of his intellectual limitations, he did not voluntarily and knowingly waive his *Miranda* rights.[1] He also argues that the trial court erred in denying his motion to suppress identification testimony of an eyewitness, which he contends was unduly suggestive and unreliable because it was secured by coercive investigatory police tactics. We conclude that the trial court's rulings denying the motion to suppress M.A.C.'s statement and admitting the identification evidence is supported by the record. Therefore, we affirm.

## I. *Factual Background*

On May 13, 1995, at about 6:30 p.m., William Zimmerman, Jr. was shot and killed in the 3100 block of Waclark Street, S.E. as he was returning to a car where friends were waiting. He had just walked his girlfriend, Kevette Holmes, to her door. Ms. Holmes testified that she looked back toward Zimmerman and saw "a boy just shooting at him." A police officer, Sean Martin, on security duty at the Mayor's home a short distance away, heard the gunshots and reported the incident to a dispatcher. Less than a minute after hearing the shots, Officer Martin saw M.A.C. walking hurriedly from the 3300 block of Brothers Place into Highview Street and removing his white shirt, exposing a white tank top. The officer called to M.A.C., who continued to remove his shirt and ran down Highview Street and into an alley in the 3400 block of Brothers Place. Officer Martin chased M.A.C. and broadcast a description for a black man wearing blue jeans, a white tank top, and white shirt running down Brothers Place. When the officer reached the mouth of the alley, he saw that M.A.C. had been stopped by two other officers, Whittington and Bruce.

Officer Whittington had heard the broadcast and stopped M.A.C., who matched the look-out description. Officer Martin identified M.A.C. as the person he had been chasing. Sergeant Joseph Thomas, testified that he went to the scene of the shooting and met the decedent's friend, Ms. Holmes. Sergeant Thomas had another officer bring M.A.C. toward a cruiser where Ms. Holmes was seated to

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.   1602, 16 L.Ed.2d 694 (1966).

see if she could identify him. Sergeant Thomas said that he asked her if she recognized anyone who committed the offense, and as she looked at M.A.C., "she said, it looks like him." When the sergeant asked if she was sure, he said that she responded negatively, "but she continued to say it looks like him as she nodded her head yes. And then she said that she was scared." He said that as M.A.C. was brought closer to the witness, "she really said it looks like him." When he asked her if she was sure, she responded "no," but nodded her head as if to say, "yes." Ms. Holmes described the shooter as wearing black jeans and a white shirt.

Ms. Holmes also spoke with Detective Robert Alder at the crime scene at about 7:15 p.m. She told him that she saw the shooter who had looked right at her, as he shot Zimmerman. She described the lighting conditions as good and said that she was paying attention. After the showup, she told Detective Adler that M.A.C. looked like the shooter, but she thought the shooter had a darker complexion and was slightly taller. Later that night, while at the homicide office, Ms. Holmes said that she was 100% certain that M.A.C. was the shooter, but she had been afraid he would see her identifying him at the showup.

Another witness, Gregory Peck, was in the area of the shooting that evening and heard the gunshots that night. He looked into the alley and saw M.A.C. pull a revolver from his pocket, climb up on a dumpster and place the weapon inside the dumpster. Later that evening, he identified M.A.C. as the person who had placed the gun in the dumpster.

M.A.C., who was fifteen years of age at the time, was taken to the a homicide branch office in the 7th District shortly before 8:00 p.m. There, he was held in an interrogation room, with his left hand secured to the floor from a two foot long

chain. At 12:47 a.m., Detective Gutherie read M.A.C. his *Miranda* rights from a PD 47 rights card, after learning that M.A.C. could not read. M.A.C. signed the card, agreeing to waive all the *Miranda* rights. M.A.C.'s principal challenge on appeal concerns whether, given his mental limitations and the circumstances under which he gave the statement, the trial court could find that he voluntarily, knowingly, and intelligently waived his *Miranda* rights. We turn to consideration of this issue and elaborate further on the pertinent factual details in the next section of this opinion.

## II. *Motion to Suppress Statements*

M.A.C. argues that the trial court erred in denying his motion to suppress statements he made while in police custody because he did not knowingly, intelligently and voluntarily waive his right to remain silent and his right to counsel. He contends that as a fifteen-year-old youth, who is mildly mentally retarded, he was incapable of waiving his privilege against self-incrimination without discussing the decision with counsel, a parent or guardian. The government argues that the trial court properly applied the relevant factors for assessing whether M.A.C. made a valid waiver of his rights after the police administered *Miranda* warnings.[2]

In *Miranda*, the Supreme Court established that statements made by an accused while in police custody are inadmissible, at least in the government's direct case,[3] unless the police, prior to questioning, warn him that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda, supra* note 1, 384 U.S. at 479, 86 S.Ct. 1602; *Lewis v. United States*, 483

---

**2.** *Miranda, supra* note 1, 384 U.S. at 436, 86 S.Ct. 1602.

**3.** *Cf. Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

A.2d 1125, 1127 (D.C.1984) (citations omitted). The accused may waive · *Miranda* rights and provide a statement to the police. *See In re C.L.W.*, 467 A.2d 706, 709 (D.C.1983); *In re F.D.P.*, 352 A.2d 378, 380 (D.C.1976) (citing *In re J.F.T.*, 320 A.2d 322, 324 (D.C.1974)). When a defendant challenges the admissibility of such a statement, the government has the burden of proving that the waivers of the privilege against self-incrimination and the right to counsel were made knowingly, intelligently, and voluntarily. *Fare v. Michael C.*, 442 U.S. 707, 724, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Ruffin v. United States*, 524 A.2d 685, 697 (D.C.1987), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988).

The Supreme Court "has emphasized that admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). However, the totality-of-the-circumstances analysis still applies in determining the validity of the waiver and the voluntariness of the statement even though the interrogation involves a juvenile. *Fare, supra*, 442 U.S. at 725, 99 S.Ct. 2560. This analysis entails an inquiry into the facts and circumstances surrounding the interrogation "to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Id.* at 725, 99 S.Ct. 2560 (citing *Miranda, supra*, 384 U.S. at 475–77, 86 S.Ct. 1602). Among the factors for consideration in the analysis pertinent to special concerns involved with young persons are the juvenile's age, experience, education, background and intelligence, the circumstances under which the statement was given, and whether the juvenile "has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725, 99 S.Ct. 2560 (citing *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286, (1979)). In assessing voluntariness,

consideration is given to evidence of physical abuse, the length of detention, the use of trickery, mental or emotional stability, mental capacity, and physical illness or injury. *See Smith v. United States*, 529 A.2d 312, 317 n. 8 (D.C.1987) (citations omitted); *see also F.D.P., supra*, 352 A.2d at 380 (citing *Rosser v. United States*, 313 A.2d 876, 878 (D.C.1974)).

The evidentiary record shows that M.A.C., a fifteen-year-old, was arrested shortly after the crime was committed and taken to the police station, where he remained until he signed a statement at about 3:40 a.m. The statement was taken by Detective Scott Gutherie, who testified at the suppression hearing. According to this detective, he arrived at the police station at about 11:15 p.m. or 11:30 p.m. and first saw M.A.C. in the main interview room at 12:40 a.m. He asked M.A.C. if he was alright and if he needed anything. He asked him if he could read, and M.A.C. responded that he could not, although he told the detective he was in the ninth grade. The detective informed M.A.C. that he was under arrest for the murder the night before on Waclark Place, S.E., and he read each of the *Miranda* rights from a PD 47 rights card, in a "slow, clear and audible voice, . . . pausing after each sentence." He testified that he then turned the rights card over and read the questions, which inquired whether he understood the rights, whether he wanted to answer questions, and whether he was willing to answer questions without having an attorney present. At 12:47 a.m. M.A.C. placed the answer, "yes" and the first two initials of his first name next to each question. Detective Gutherie then asked M.A.C. to tell him where he was at the time of the murder. M.A.C. said that he was coming from Ballou High School and walking toward his house when he heard gunshots and ran because he was scared. About 1:00 a.m., the detective asked M.A.C. whether he wanted a cigarette or some water, and M.A.C. said that he did. Detective Gutherie left the room for about twenty minutes and returned with the re-

quested items, which he gave to M.A.C. The detective questioned M.A.C. again, and he gave the same story. The detective told M.A.C. that he did not believe that he was telling the whole truth, and he left the room again for twenty minutes.

When Detective Gutherie returned, he told M.A.C. that he thought he was leaving something out of the story and that people from the area of the crime had led him to believe that he was involved. M.A.C. then admitted that he found the gun and shot the victim when he came running toward him, demanding to know what he was doing. The detective asked M.A.C. if he would give a written statement, and M.A.C. agreed to do so. The detective again inquired whether M.A.C. needed anything, and M.A.C. asked for more water, which the detective obtained. The detective began typing the statement at 2:45 a.m. The statement, which was typed on a police form (PD 118), is preceded by the *Miranda* warnings and by the same questions which appear on the PD 47. The detective testified that he read M.A.C. his rights again in the same manner as before and that M.A.C. agreed to answer questions without a lawyer. According to the detective, M.A.C. again wrote yes and initialed each of the questions, indicating his agreement to answer questions without an attorney present. Detective Gutherie testified that he typed each question, read it orally to M.A.C. and took down M.A.C.'s answers verbatim. They began the statement at 2:45 a.m., and at 3:15 a.m. M.A.C. requested, and was taken, to the bathroom.

Detective Gutherie testified that he asked M.A.C. whether he had a learning problem, and M.A.C. inquired "whether he meant, was he 'slow.'" Detective Gutherie answered yes, and M.A.C. responded that he was slow in reading, spelling and math. Detective Gutherie testified that M.A.C. appeared to understand every question and confirmed orally that he did. M.A.C. told the detective that he was not under the influence of drugs or alcohol. In the written statement, M.A.C. stated that he found the gun and shot the victim out of fear as the victim was running toward him.[4] Detective Gutherie also testified that M.A.C. had seven prior felony arrests and that he had been read his rights six times, invoking the right to remain silent on five prior occasions.

Detective Gutherie testified that while in the interrogation room, M.A.C.'s left hand was handcuffed to a chain secured to the floor, although in such a way that he could stand. The detective obtained the telephone number for M.A.C.'s mother, but he did not call her nor M.A.C.'s grandmother, with whom M.A.C. actually lived. M.A.C. did not request that they be called.

The defense called Dr. Sarah Jane Elpern, a clinical psychologist, who administered several tests to M.A.C., including an IQ test, a "receptive language" test, and an educational achievement test. Dr. Elpern testified that M.A.C. was mildly mentally retarded, with a verbal IQ of 62, a performance IQ of 71, and a full-scale IQ of 64. She testified that his verbal comprehension score was 65, and his ability to pay attention when someone is talking was 58, *i.e.*, borderline between mild and moderate mental retardation. She testified that M.A.C. could read only at the kindergarten to first grade level and that he tries

4. M.A.C.'s written statement about the crime to Detective Gutherie included the following:

I was coming from the festival. I was walking and I took the little side street. So as I was walking I was close by to some bushes. That's when I seen the brown handle of a gun. So I picked it up. As I was picking it up, that's when I seen somebody running towards me screaming and ask me what I was doing, what the f—k is you doing. I was in a state of shock, I got scared. When I seen him running towards me, is when the gun went off. Then I started running. When I started running, I just turned around and seen him running. I then saw the police and I threw the gun in the trash can. That's when the other police pulled me over. The two lady police. Then they locked me up. They was asking me some questions.

to rely on word recognition. She testified that she gave M.A.C. a Peabody Picture Vocabulary Test, and he achieved a score of 63. She said that his ability to comprehend orally and to communicate was limited and variable. When she tried to engage him in conversation about his family, he was sensitive about the subject and indicated that he did not want to talk about it. He did say that his mother did not live with the family, although he saw her everyday.

In making its factual findings, the trial court credited the testimony of Detective Gutherie. The court found that the detective had informed M.A.C. of his rights slowly and clearly after ascertaining immediately that he could not read. Although M.A.C. was handcuffed, it was in a manner that did not place him in an uncomfortable position. The detective offered M.A.C. cigarettes and water, obtained them for him upon request, and inquired whether he needed anything. The court inferred, therefore, that M.A.C. was aware that he was free to make requests of the detective. The court further found that the detective never yelled at M.A.C.; that M.A.C. appeared to understand his rights and the questions asked; and that he did not appear to be fearful or fatigued. In concluding that the statement was voluntarily, knowingly, and intelligently given, the court also took into account M.A.C.'s other numerous prior experiences with the legal system and advice of rights and that the detective had not used coercive tactics, trickery or deception to obtain the statement. The court concluded that evidence of M.A.C.'s low scores on the intelligence tests was not sufficient to overcome the other evidence that he understood his rights and voluntarily agreed to relinquish them. The court further explained

> ... what we have is a young man that's familiar with the streets, that was treated well by the police, it took time to get the statement.... There was nothing coercive about the situation, there was nothing coercive about that environment

that forced the respondent to give the statement.

> His rights were orally read to him. [The detective] took care that he was nice and audible because of his knowledge that the respondent did not know how to read. He never voiced any displeasure.... When he was with a clinical psychologist who's even trained to make people feel comfortable, who's even trained to get them to talk to them, he knew what to control and what not to talk about and what to talk about, and he controlled it, and he knew how to do it and when to do it ... and he could have done the same thing in the interrogation room if, in fact, there was anything he did not want to talk about or anything he did not want to discuss, and none of that comes out here.

■ If there is substantial evidence in the record to support the trial court's factual findings of a knowing, voluntary, and intelligent waiver of *Miranda* rights, we will uphold them. *C.L.W., supra,* 467 A.2d at 709 (citing *In re M.D.J.,* 346 A.2d 733, 735 (D.C.1975)). However, we review the trial court's legal conclusions *de novo. Hicks v. United States,* 705 A.2d 636, 639 (D.C.1997) (citing *Lewis v. United States,* 632 A.2d 383, 385 (D.C.1993)). " 'The ultimate issue of "voluntariness" is a legal question....' " *United States v. Thomas,* 595 A.2d 980, 982 (D.C.1991) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)) (quoting *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)).

■ The record indicates that there was substantial evidence to support the trial court's factual findings that M.A.C. knowingly and intelligently waived his *Miranda* rights, in spite of evidence that he had a low I.Q. A low I.Q., standing alone, will not render an otherwise voluntary and knowing confession inadmissible. *See C.L.W., supra,* 467 A.2d at 709; *see also State v. Brown,* 112 N.C.App. 390, 436 S.E.2d 163, 167 (1993) (citations omitted). In *C.L.W.,* in denying a motion to suppress

statements filed on behalf of a fifteen-year-old with an I.Q. of 74 at the time of his arrest, the court took into consideration other circumstances surrounding the taking of the statement which showed that the waiver was knowingly and intelligently made. 467 A.2d at 709. These included: (1) the advice of rights provided orally and in writing; (2) the absence of coercive police conduct, promises, or signs of emotional disturbance during the interview; (3) the respondent's apparent and expressed understanding of his rights, and the absence of evidence to show otherwise; (4) his age; and (5) prior experiences with the legal system, gained from numerous arrests. Essentially, in *C.L.W.*, in upholding the determination that the youth knowingly and intelligently waived his right to remain silent and to counsel, the court engaged in a totality of the circumstances analysis, consistent with the Supreme Court's pronouncement in *Fare, supra.* This analysis "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare,* 442 U.S. at 725, 99 S.Ct. 2560 (citing *Butler, supra,* 441 U.S. at 373, 99 S.Ct. 1755); *see also In re W.B.W.,* 397 A.2d 143, 145 (D.C.1979); *F.D.P., supra,* 352 A.2d at 380. The youth's intelligence, as measured by testing, is only one of many factors for consideration.

M.A.C. points out other factors which he contends dictate against a finding of a knowing, intelligent, and voluntary waiver in his case. Specifically, in addition to his age and low level of intelligence, he cites the manner in which he was attached to the floor and the length of time that he was held. Obviously, these are important factors for consideration. However, they do not compel vitiation of a confession found to be valid based upon consideration of all the circumstances surrounding its making. *See, e.g., C.L.W., supra,* 467 A.2d at 709. In *C.L.W.,* in spite of the respondent's low I.Q., the lateness of the hour, the lack of food and parental contact, and being handcuffed to a desk, when other relevant factors were considered, this court concluded that the trial court's finding of a knowing and intelligent and uncoerced waiver was based upon substantial evidence.

Similarly, in this case, the overall circumstances support the trial court's factual findings and legal conclusion. In summary, the transcript reveals that M.A.C. was questioned by a single detective who took care to explain his rights more than once and to ensure that he understood them. The evidence credited by the court showed that M.A.C. understood those rights in spite of his intellectual limitations. The trial court took into account that M.A.C. had extensive prior experiences with the police during which he had sometimes invoked his *Miranda* rights and sometimes waived them. The court found no improper interrogation tactics or other evidence that the statement was extracted involuntarily from M.A.C. Therefore, we hold that there is substantial evidence in the record from which the trial court could find that M.A.C. knowingly, intelligently, and voluntarily waived his *Miranda* rights and conclude, in the totality of the circumstances, that M.A.C.'s statement to the police was voluntary.

### III. *The Challenged Identification Evidence*

Finally, M.A.C. argues that the trial court erred in denying his motion to suppress the identification of him made by Kevette Holmes, an eyewitness to the murder. M.A.C. challenges the identification as unreliable on the grounds of undue suggestivity and coercive police tactics. He argues that the police refused to accept her unambiguous statement that M.A.C. was not the person who shot Zimmerman. He contends that Ms. Holmes' subsequent identification of M.A.C. as the shooter some six hours later was coerced because

the police made it clear that she could not leave the police station unless she identified M.A.C. as the shooter and that she did so only after learning that Zimmerman had died. The government argues that the out-of-court identification was not suggestive, was reliable and did not taint the in-court identification. It also contends that the identification did not result from improper coercion.

M.A.C. was apprehended by the police shortly after the shooting. While Ms. Holmes was seated in the police cruiser with police Sergeant Joseph Thomas, M.A.C. was brought toward the vehicle. Sergeant Thomas asked her if she recognized anyone who had committed the offense, and she looked at M.A.C. and said "it looks like him." When he asked her if she was sure, she responded negatively, but "she continued to say it looks like him as she nodded her head yes." She told Sergeant Thomas that she was scared. Detective Adler testified that he spoke with Ms. Holmes who told him that the person she had been shown looked like the shooter, but she thought he had been darker complected and slightly taller.

The trial court denied the motion to suppress the show-up identification, concluding that it was not unduly suggestive. Crediting the testimony of Sergeant Thomas, the trial court found that there was only one show-up identification of M.A.C. to Ms. Holmes.[5] The court determined that beyond the suggestivity inherent in any show-up identification, there was no action by the police that rendered this one unduly suggestive. The court found that Sergeant Thomas had merely told the witness that they were going to show her someone to see if she could recognize him. When the witness could not see M.A.C. well from some distance away, he had to be brought closer. The court found no preparation of the witness for the show-up which would indicate that

there was undue suggestivity. In addition, the court found that Ms. Holmes said initially that M.A.C. looked like the shooter, but out of fear said "no," while appearing by action to be saying more yes than no.

At trial Ms. Holmes testified that she saw M.A.C. shoot her friend and then run down an alley in front of her building. She said that M.A.C. looked right at her, passing within thirteen to fourteen feet. She testified that it was broad daylight, that nothing was obstructing her view of M.A.C., and that she got a good look at him. According to Ms. Holmes, while in the police car, M.A.C. was shown to her, and the officer asked if he was the one. She responded, "yes, that looks like him." She said that the officer did not tell her anything before she made the identification. She said that they brought M.A.C. within thirty to forty feet of the vehicle. She explained that she only responded that M.A.C. was not the person at one point because she was afraid that he might see her. She said that she knew what he looked like and everything he was wearing.

Ms. Holmes also testified that she went to the police station where she remained from 7:00 p.m. until 1:00 a.m. and that she did not want to be there. Initially, Ms. Holmes told a Detective Wilbur while at the station that M.A.C. was not the assailant. She testified at trial that she did so because she was afraid. Although the police did not take her home until after she made her statement identifying M.A.C., she said that she did not get the impression that the police were trying to convey the message that she could go only if she identified M.A.C. Ms. Holmes admitted telling an investigator for the defense that she decided to tell the police that M.A.C. was the killer after she learned that her boyfriend had died because she was tired and wanted to get out of the police station. She explained that she made that statement to the investigator because she was

---

**5.** There had been some suggestion that there might have been more than one show-up identification procedure. Based on the evidence, the trial court concluded that there was only one show-up involving Ms. Holmes.

upset that they had her father's address and knew where she lived. In court, she identified M.A.C. as the shooter and said that she was a 100% certain of the identification. She described the shooter as around fourteen or fifteen, "five-five or five-four" in height, medium complexion, bushy hair, around 120 pounds and wearing a white T-shirt and dark colored jeans.

In its factual findings at the conclusion of the presentation of the evidence, the trial court found that Ms. Holmes' testimony was credible concerning that she observed the person who shot her friend from approximately ten feet away. The court found that she identified M.A.C., who had passed right in front of her. The court accepted as logical Ms. Holmes' explanation that she stated otherwise out of fear. The trial court also found credible Ms. Holmes' testimony about how the murder occurred.

Unduly suggestive identifications which are unreliable violate principles of due process, and therefore are inadmissible. *Sheffield v. United States,* 397 A.2d 963, 966 (D.C.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979). It is only where the circumstances of an identification were so unduly suggestive that there is a substantial likelihood of irreparable misidentification that suppression of an identification is warranted. *United States v. Hunter,* 692 A.2d 1370, 1375 (D.C.1997) (citing *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) and *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). While some suggestivity is inevitable in a show-up identification following the commission of a crime, it is recognized that a prompt show-up may enhance reliability of an identification and might exonerate an innocent person who has been apprehended mistakenly. *Hunt-*

er, 692 A.2d at 1375 (citing *Russell v. United States,* 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969)). Thus, "show-up identifications, while inherently suggestive, do not presumptively violate due process." *In re B.E.W.,* 537 A.2d 206, 207 (D.C.1988).

In this case there was a prompt show-up following the shooting close to the scene of the crime. The validity of such a procedure has been upheld repeatedly. *Hunter, supra,* 692 A.2d at 1375 (citing *Turner v. United States,* 622 A.2d 667, 672–73 (D.C.1993); *Singletary v. United States,* 383 A.2d 1064, 1068 (D.C. 1978); *Russell, supra,* 133 U.S.App.D.C. at 81, 408 F.2d at (1284)). As explained in *Singletary, supra,*

> a defendant is not denied due process of law unless, in the totality of the circumstances, the on-the-scene confrontation was unnecessarily suggestive and conducive to the substantial likelihood of irreparable misidentification.... In considering the totality of the circumstances, an immediate on-the-scene confrontation has uniquely powerful indicia of reliability which more than counterbalance any suggestivity, absent special elements of unfairness.... Furthermore, something more egregious than mere custodial status is required in order to establish such special circumstances.

*Singletary,* 383 A.2d at 1068 (citations omitted). Here, the court specifically found there was no improper police conduct in the show-up procedure when Ms. Holmes, while seated in the police car, initially identified M.A.C. as the shooter, saying, "it looks like him."[6] There is an evidentiary basis for the trial court's determination on this issue based on the testi-

---

6. M.A.C. *seems to argue in his brief that,* contrary to Sergeant Thomas' testimony at the suppression hearing, Ms. Holmes testified on direct examination at trial that she told him unequivocally that M.A.C. was not the shooter. This claim is belied by the record.

Ms. Holmes testified that she told Sergeant Thomas, "yes, it looks like him." She testified that she subsequently told another police officer that M.A.C. was not the shooter because she was afraid.

mony of Sergeant Thomas at the suppression hearing, which the trial court credited in making its ruling. This court gives deference to the trial court's determination of credibility. *B.E.W., supra*, 537 A.2d at 207 (citing *Franey v. United States*, 382 A.2d 1019, 1022 (D.C.1978)). Although M.A.C. was in custody at the time, the trial court found, and the evidence supported, that the police conduct was neutral. Where the identification procedures are not unduly suggestive, the court need not evaluate reliability. *Hunter*, 692 A.2d at 1375 (citing *Greenwood v. United States*, 659 A.2d 825, 828 (D.C.) *cert. denied*, 516 U.S. 925, 116 S.Ct. 326, 133 L.Ed.2d 227, (1995)).[7] The absence of any showing of undue suggestivity defeats M.A.C.'s due process challenge to the show-up identification. *Hunter*, 692 A.2d at 1375.

M.A.C. argues that under the totality of the circumstances, the identification by Ms. Holmes was unreliable and should have been excluded. Although a defendant may not be able to demonstrate that a show-up identification is constitutionally infirm, he may still challenge at trial its admissibility on the ground that it is so unreliable as to lack probative value. *Sheffield, supra*, 397 A.2d at 967. While M.A.C. did not object to the admissibility of the testimony at trial or move to strike, in support of his motion for judgment of acquittal, he argued that "Miss Holmes' recantation of her initial statement is a result of coercion ... on the part of police and not freely given, therefore it's unreliable." He makes the same argument on appeal. He contends that her identification of M.A.C. was coerced by the police, who kept her at the police station until after she had signed the statement implicating M.A.C. He argues that her explanation of fear as the reason for her reluctance to identify M.A.C. is not plausible.

According to Ms. Holmes' testimony at trial, she knew that M.A.C. was the person who shot Zimmerman, but she was afraid initially to identify him. She testified that she got a good look at him at the time of the shooting and that she identified him because he was the assailant, and not because of any action of the police. Ms. Holmes denied that she signed the statement identifying M.A.C. as the killer only because she was tired and wanted to go home, although she acknowledged making that statement to a defense investigator. On re-direct examination, Ms. Holmes explained that the reason for her statement to the investigator was because she was upset that defense representatives had her father's address and M.A.C. knew where she lived. The trial court found her explanation to be logical and credited it. We find no basis to disturb the trial court's ruling in this regard. The trial court found it plausible that Ms. Holmes, who had witnessed the murder and knew that the killer had looked her in the face while making his escape, was motivated by fear in her hesitation to identify M.A.C. rather than coercive police tactics. We can not say on this record, as a matter of law, that the identification was the product of coercion.

Inconsistencies in witness' statements present questions of credibility, and issues of credibility are committed to the sole and sound discretion of the fact finder. *Payne v. United States*, 516 A.2d 484, 493 (D.C.1986). In *Payne*, appellants argued that a witness' testimony on direct-examination implicating them in the robbery should be disregarded because it was recanted on cross-examination. We held that recantation on cross-examination did not make the testimony inherently incredible as a matter of law, but like other internal inconsistencies within the witness' testimony, created fac-

---

7. We reiterate, however, that it is in the best interest of the government and the defense that the trial court rule on the reliability of an identification even when it does not find that

there was undue suggestivity. *Williams v. United States*, 696 A.2d 1085, 1086 (D.C.1997) (citations omitted).

tual issues for the trier of fact to resolve. *Id.* at 493 (citations omitted). A witness' identification testimony on direct-examination can provide the necessary predicate for admission of his pretrial identification statements even though the witness recants the identification during cross-examination. *Scales v. United States*, 687 A.2d 927, 931 (D.C.1996). While evidence of a witness' prior identification is inadmissible where the witness is uncertain or repudiates the prior identification at trial, a prior identification is admissible where the witness affirms it under oath at trial. *Id.* This principle guides our determination here. Prior inconsistent statements of an identification witness are appropriate for consideration in assessing the witness' credibility. *See id.* There may be numerous reasons for the inconsistencies, which may " 'have nothing to do with furthering truth or justice.' " *See Payne,*

516 A.2d at 493 (quoting *Godfrey v. United States*, 454 A.2d 293, 300 n. 26 (D.C. 1982)). Here, the trial court could reasonably find credible Ms. Holmes' testimony that her inconsistent statements concerning the identification resulted from fear. That was within its province as the trier of fact. For these reasons, we reject M.A.C.'s argument that the trial court erred in declining to hold the identification inherently incredible.[8]

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*

---

8. We note that there is evidence that supports reliability of the identification in this case. Ms. Holmes testified that she looked at the shooter and the shooter looked at her in broad daylight from approximately a thirteen or fourteen foot distance. Her description to the police was consistent with M.A.C.'s appearance and dress. Ms. Holmes identified him initially, stating, "Yes, it looks like him." Ms. Holmes had a plausible explanation for her inconsistent statements, and she was certain of her identification at trial.