UNITED STATES of America,
Plaintiff,

v.

Paul A. ASKEW, Defendant.

No. CRIM.A. 04–0010(PLF).

United States District Court,
District of Columbia.

April 13, 2004.

Karen Davis Miller, Assistant United States Attorney, Washington, DC, for Government.

Richard Samad, Washington, DC, for Defendant.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on the defendant's motion to suppress the principal tangible evidence supporting his indictment for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for One Year or More. *See* 18 U.S.C. § 922(g)(1). The hearing on this motion took place on March 10 and, after the parties made further submissions, on March 26, 2004. Upon consideration of the memoranda submitted by counsel for both sides, the relevant case law, the testimony of the witnesses and the arguments of counsel, the Court has determined to deny the motion to suppress. The Court issued an Order denying the motion on April 2, 2004, and advised counsel that this Opinion would be forthcoming. The following constitutes the Court's findings of fact and conclusions of law.

## I. FACTUAL BACKGROUND

On the night of December 19, 2003, around 11:00 p.m., a radio run alerted Officer Anthony Bowman of the Metropolitan Police Department to a report of an armed robbery in the 700 block of 9th Street, S.E., in Washington, D.C. Transcript of Hearing, March 10, 2004 ("March 10 Tr.") at 4–5. Officer Bowman canvassed the area in his patrol car, looking for individuals matching the description of the perpetrator: a black male, approximately six-feet tall, wearing a blue sweatshirt and blue jeans. *See* March 10 Tr. at 5–6, 11, 19. The radio report reflected that the perpetrator had been last seen moving on 9th Street, S.E., in an unknown direction. *See id.*

Within two minutes of the radio report, and within approximately ten minutes of the robbery, Officer Bowman spotted defendant Paul Askew walking in the 200 block of 9th Street, S.E., five blocks from the scene of the robbery. *See* March 10 Tr. at 6–7. Upon seeing Officer Bowman, the defendant turned and walked in a different direction, but Officer Bowman continued to follow the defendant in the patrol car. *See id.* at 10–11. Defendant is a black male, six-feet, three-inches tall, and at the time was wearing clothing quite similar—but not identical—to the description broadcast over the police radio. While the description of the perpetrator mentioned a blue sweatshirt and blue jeans, Officer Bowman testified that the defendant was wearing blue sweatpants, "a navy blue jacket[, and] a darker blue fleece type jacket underneath. He had on two jackets." March 10 Tr. at 11. Officer Bowman reported to the dispatcher that Askew "vaguely match[ed] th[e] description." Transcript of Radio Run, Gov't Ex. 2 at 3. After noticing that the defendant had a moustache, Officer Bowman checked with the dispatcher to determine whether the robber also had a moustache. *See* March 10 Tr. at 8, 10–11. When the dispatcher responded affirmatively, Officer Bowman stopped the defendant. *See id.* at 11.

Officer Bowman asked the defendant to come to the patrol car, and he complied. The defendant also complied with Officer Bowman's further requests that he produce some identification, take his hands out of his pockets, and place his hands on the top of his head. *See* March 10 Tr. at 12. Officer Bowman then told the defendant that he was being stopped because of his physical similarity to the description of a robber. *See id.* at 12–13. When back-

up units arrived, Officer Bowman returned to the interior of his car to check whether the police department computer returned any information on the defendant. Officer Bowman's back was turned for the next couple of minutes and he did not see the pat-down of the defendant that followed. *See id.* at 13–14, 21–22, 36.[1]

Officer James Koenig conducted a pat-down of the defendant and found nothing. *See* Transcript of Hearing, March 26, 2004 ("March 26 Tr.") at 6–7, 16.[2] Shortly afterwards, another officer, Officer Benton, drove the robbery victim to the place where the defendant was being detained, for the purpose of conducting a show-up. *See* March 10 Tr. at 53–56. The victim remained in the car while Officer Koenig and Officer Anthony Willis brought the defendant to a place where he could be seen by the victim. *See* March 26 Tr. at 8. The defendant was not in handcuffs at that time. *See* March 10 Tr. at 45–49; March 26 Tr. at 8. Preparatory to the show-up, Officer Willis attempted to unzip the defendant's outer jacket to reveal the sweatshirt underneath so the victim could better determine if the defendant was the robber. *See* March 26 Tr. at 8. Officer Willis testified that he remembered the "blue hooded sweatshirt" described in the radio run and "wanted the complainant to see what [the defendant] had on to make sure that he

wasn't zipping nothing up to cover up. So I went to unzip it down so that . . . they could see what he had on." *Id.*[3] Officer Willis had difficulty, however, in unzipping the jacket when the zipper hit what he described as a "hard" or "solid" object and "didn't go past [the object]. It stopped there. And at that time, that's when [the defendant] knocked my hand down," away from the zipper. *Id.* at 12; *see also id.* at 8–9, 17–18.

After the show-up, Officer Willis and Officer Edward Snead walked the defendant backwards toward the car, placed him on the hood of the car, and unzipped his jacket. *See* March 10 Tr. at 53–56; March 26 Tr. at 9–10, 17–18.[4] Visible once the jacket was unzipped was an open black waist pouch, or "fanny pack," with a silver object sticking out. *See* March 26 Tr. at 10, 17–19. On further inspection, the silver object was identified as a gun, and the defendant was handcuffed and arrested. *See id.* at 10–11.

The defendant was indicted for firearm and ammunition possession—not robbery—and filed this motion seeking suppression of the evidence discovered after he was stopped by Officer Bowman. He claims that the stop and the police action following the stop violated the Fourth Amendment and asks that any evidence

1. Although Officer Bowman also testified about what he assumed happened during the pat-down and the unzipping of the defendant's jacket, in the end it became apparent during the course of his testimony that Officer Bowman did not witness either. *See* March 10 Tr. at 41–42.

2. Officer Koenig did not testify at the suppression hearing. His partner, Officer Anthony Willis, did. Officer Willis described the pat-down in some detail. *See* March 26 Tr. at 6–8. He suggested that Officer Koenig had not completed the pat-down, perhaps because of some resistance by the defendant, when Officer Benton arrived with the robbery victim

for a show-up. *Id.* at 8. The government acknowledges that when Officer Koenig patted the defendant down, he did not find anything. The subsequent discovery of the gun at issue here was not the result of this pat-down. *See id.* at 24.

3. The radio run in fact did not mention a blue "hooded" sweatshirt, only a "blue sweatshirt." *See* Gov't Ex. 2 at 2.

4. Officer Benton did not advise Officer Willis and his colleagues whether the complainant had made an identification. *See* March 26 Tr. at 13, 18–19.

discovered as a result of the unconstitutional actions be suppressed.

## II. ANALYSIS

### A. The Terry Stop

Beginning with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court has recognized that police are entitled to stop a suspect on less than probable cause and frisk or pat-down that individual to determine whether the suspect is armed. These stops and frisks are constitutional if supported by "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity," *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), or that criminal activity "may be afoot." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *see also United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *United States v. Brignoni–Ponce,* 422 U.S. 873, 882–83, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. at 30, 88 S.Ct. 1868. The Court assesses whether there is reasonable suspicion by looking at "the whole picture" from the perspective of "those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *see also United States v. Edmonds,* 240 F.3d 55, 59 (D.C.Cir.2001) (court "does not separately scrutinize each factor relied upon by the officer. . . . [T]he question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them.").

■ In the present case, Officer Bowman found the defendant five blocks away from the scene of an armed robbery minutes after the robbery occurred, on the street where the robber was last seen. The defendant closely matched the description of the robber, and changed course upon seeing the officer. Under these circumstances, Officer Bowman was well within his authority to detain the defendant to determine whether he committed the robbery, and Officer Koenig was likewise justified in frisking the defendant to determine whether he was armed.

The defense points to minor discrepancies between the description broadcast of the robber and the appearance of the defendant that night. Specifically, the defendant notes that he was wearing sweatpants, not jeans, and that he is somewhat taller than the person described in the radio run. These minuscule differences do not come close to negating the reasonable suspicion Officer Bowman had that the defendant was involved in criminal activity. A victim of an armed robbery might be slightly mistaken in remembering what kind of pants the robber wore, and precise evaluations of height are difficult to make in far less tense situations. The Court concludes that the stop and Officer Koenig's pat-down were constitutional.

### B. The Discovery of the Weapon

The more difficult question is whether the police conduct that led to their feeling a hard object in the course of the show-up and the subsequent discovery of the weapon were constitutional. The initial pat-down by Officer Koenig did not reveal the presence of any weapon, and it was only as Officer Willis attempted to unzip the defendant's jacket that a hard object, later found to be a gun, was discovered. The victim had reported being robbed by someone wearing a blue sweatshirt. Officer Willis could see that the defendant was wearing a blue sweatshirt, but it was mostly covered by a blue jacket. Officer Willis attempted to unzip the outer jacket to allow the victim to see the defendant in the sweatshirt. At that point the zipper contacted a hard or solid object at the defendant's waist and would not go past it. After the show-up was completed, the offi-

cers unzipped the jacket to determine whether the hard object was a weapon; they found the gun, a portion of which was plainly visible once the outer jacket was unzipped.[5]

 If it was constitutional for Officer Willis to unzip the jacket in the course of the show-up, the later investigation to determine whether the hard object was a weapon certainly was constitutional. There can be no doubt that an officer's discovery of a hard object on a suspect's person warrants further investigation to assess the safety threat posed by the suspect. *See, e.g., Minnesota v. Dickerson,* 508 U.S. 366, 376, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("The very premise of *Terry,* after all, is that officers will be able to detect the presence of weapons through the sense of touch ..."); *Terry v. Ohio,* 392 U.S. at 30, 88 S.Ct. 1868 ("Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed *and to disarm them once he discovered the weapons.*") (emphasis added); *United States v. Smart,* 98 F.3d 1379, 1384–85 (D.C.Cir. 1996) (holding that a *Terry* stop is reasonable if police have reasonable suspicion that the suspect is involved in some sort of criminal activity, and that a *Terry* frisk is reasonable if there are grounds to believe the suspect is armed and dangerous).[6] Indeed, even where police officers cannot see or feel a weapon, they are permitted to retrieve a weapon hidden on a suspect's person if they have reasonable suspicion to believe that the suspect is carrying one. *See Adams v. Williams,* 407 U.S. 143, 145–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (informant tipped police that the suspect was carrying a gun); *United States v. Reyes,* 349 F.3d 219, 222, 225 (5th Cir. 2003) (drug-sniffing dog reacting to the suspect, barking, and following him); *United States v. Thompson,* 597 F.2d 187, 191 (9th Cir.1979) (suspect kept reaching for something in his inside coat pocket); *but see United States v. Casado,* 303 F.3d 440, 447–49 (2d Cir.2002) (officers constitutionally could frisk a suspect who refused to take his hand out of his pocket, but holding that the officers' entry into the pocket before conducting a frisk was unconstitutional).

 Once a suspect has been detained constitutionally under *Terry,* it is no further intrusion into the suspect's justifiable expectation of privacy or his freedom of movement for a witness to view him, either at the place where he was stopped or at the scene of the crime. As such, the Fourth Amendment presents no impediment to show-ups involving suspects who are constitutionally detained. After all, what makes the detention constitutional is the reasonable suspicion that the suspect committed the crime that the witness saw; showing the suspect to the witness to de-

---

5. Although the gun was in plain view once the outer jacket was fully unzipped, the officers' discovery of the gun is not justifiable under the plain view doctrine. *See generally Kyllo v. United States,* 533 U.S. 27, 31–33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); *Arizona v. Hicks,* 480 U.S. 321, 324–25, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Texas v. Brown,* 460 U.S. 730, 737–41, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion); *Coolidge v. New Hampshire,* 403 U.S. 443, 464–73, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The initial unzipping of the jacket was for the purpose of exposing the sweatshirt for the show-up, and the process of unzipping for show-up purposes first must be found to be constitutionally permissible before a further intrusion would be justifiable under *Terry.*

6. Officers also are permitted to investigate bulges in suspects' clothing, where it is reasonably possible that the bulge is caused by a weapon. *See, e.g., Pennsylvania v. Mimms,* 434 U.S. 106, 111–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Baker,* 78 F.3d 135, 138 (4th Cir.1996); *United States v. Hill,* 545 F.2d 1191, 1193 (9th Cir.1976) (per curiam).

termine if the suspect committed the crime is *per se* reasonable under the Fourth Amendment, assuming that *Terry*'s requirements of reasonable suspicion and a reasonable duration for the detention have been satisfied. And here they have been. *See supra* Section II(A). The Court therefore turns to the constitutional touchstone for procedures relating to on-the-scene show-ups—which is not the Fourth Amendment at all, but the Due Process Clause of the Fifth and Fourteenth Amendments. *See, e.g., Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Less than a year after the Supreme Court's trilogy of identification decisions, *Wade, Gilbert,* and *Stovall,* the D.C. Circuit addressed the constitutionality of a one-person, on-the-scene, uncounseled show-up for identification purposes. While it did not discuss expressly the Fourth Amendment implications of such a procedure, the court of appeals concluded that it simply is "not improper for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before." *Russell v. United States,* 408 F.2d 1280, 1284 (D.C.Cir.1969).[7] Likewise, bringing the complainant to the detained suspect is not a *per se* constitutional violation. On the contrary, as the D.C. Circuit has long held, on-the-scene identifications are a valuable investigative technique, for they allow the police to determine quickly whether the suspect committed the crime so that there is a heightened chance of apprehending the perpetrator if the witness tells the

police that they have detained the wrong person. Minimizing the time between the crime and the identification also makes identifications more reliable, as suspects lack the time to change their appearances and witnesses' memories are fresh. *See United States v. Singleton,* 702 F.2d at 1165–67; *United States v. Perry,* 449 F.2d at 1032–34; *Russell v. United States,* 408 F.2d at 1284; *see also United States v. King,* 148 F.3d 968, 970 (8th Cir.1998); *Johnson v. Dugger,* 817 F.2d 726, 729 (11th Cir.1987); *In re M.A.C.,* 761 A.2d at 41.

■ It goes without saying, however, that the procedures whereby an on-the-scene show-up is conducted could in some cases be so suggestive as to violate the Constitution. Courts assess the constitutionality of show-ups under a totality-of-the-circumstances test, attempting to determine whether the particular identification procedure is sufficiently reliable to comply with the Constitution or is so unnecessarily suggestive and conducive to irreparable misidentification as to violate due process. *See Stovall v. Denno,* 388 U.S. at 302, 87 S.Ct. 1967. "[A]bsent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *Russell v. United States,* 408 F.2d at 1284; *see also United States v. Perry,* 449 F.2d at 1037–38 (noting that while some suggestiveness "unavoidably inheres" in every one-person show-up, the promptness of the show-up, freshness of identification or non-identification and other relevant factors enhance reliability and thus "countervail to insulate the confronta-

---

7. In *Russell* there was probable cause to arrest the suspect. *See Russell v. United States,* 408 F.2d at 1281 n. 3. Other cases make clear, however, that police need not have probable cause to conduct a show-up. *See United States v. Hines,* 455 F.2d 1317, 1325 (D.C.Cir.1971); *see also United States v. Singleton,* 702 F.2d 1159, 1164 (D.C.Cir.1983);

*United States v. Perry,* 449 F.2d 1026, 1029 & n. 8 (D.C.Cir.1971); *In re M.A.C.,* 761 A.2d 32, 34–35 (D.C.2000); *cf. Hayes v. Florida,* 470 U.S. 811, 816–17, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (stating in dicta that probable cause is not always necessary for police to conduct "a brief detention in the field for the purpose of fingerprinting").

tion against the ignominy of a constitutional violation"). Despite some concerns expressed about show-ups, on balance, the D.C. Circuit has concluded that prompt on-the-scene confrontations "will 'if anything promote fairness, by assuring reliability.'" *United States v. Perry*, 449 F.2d at 1031 (quoting *Russell v. United States*, 408 F.2d at 1284, in turn quoting *Wise v. United States*, 383 F.2d 206, 209 (D.C.Cir.1967)).

While due process concerns constrain the procedures employed at show-ups, certain practices have been recognized as permissible ways of assisting the witness in identifying whether the suspect committed the crime. Especially relevant for the purposes of this case, some courts have held that suspects may be required to don certain clothing similar to that worn by the perpetrator. *See People v. Brisco*, 99 N.Y.2d 596, 758 N.Y.S.2d 262, 788 N.E.2d 611 (2003) (memorandum) (holding that forcing the suspect to hold a pair of shorts belonging to the suspect and similar to that worn by the perpetrator did not violate the Constitution); *People v. Morris*, Super. Ct. No. SF076467A, 2002 WL 90811, at *3 (Cal.App. Jan.24, 2002) (unpublished) (holding that forcing the defendant to wear a shower cap and display a jacket in a show-up that were similar to those worn by the robber did not violate the Constitution).[8]

■ These cases do not mean that the law in this regard is settled, and one can surely imagine instances where requiring a suspect to wear certain clothing would be so unnecessarily suggestive or likely to lead to a misidentification as to deny him due process. Nevertheless, the action involved in this case—unzipping a suspect's jacket so the victim could see a sweatshirt worn by the suspect—is comparatively quite minor. Nobody has suggested, or reasonably could suggest, that unzipping the defendant's jacket made the identification process so suggestive as to violate due process. The sweatshirt was, after all, the defendant's, there is nothing to indicate that the sweatshirt was at all distinctive, and—unlike the situation presented to the courts in *Brisco* and *Morris*—the defendant already was wearing it at the time of the stop. It therefore was reasonable for Officer Willis to attempt to give the victim an unobstructed view of the defendant and the sweatshirt, and the unzipping of the outer jacket was a reasonable way of achieving that end. Once a hard object was felt during that process, the more successful and complete unzipping of the jacket in search of the hard object was reasonable under the Fourth Amendment, and it too, therefore, was constitutional. *See supra* at 5.

For the foregoing reasons, defendant's motion to suppress tangible evidence is DENIED.

SO ORDERED.

---

8. Analogous are cases holding that police may require suspects to engage in non-testimonial acts, including the wearing of clothing, without violating the constitutional privilege against self-incrimination. *See* WAYNE R. LA-FAVE, ET AL., CRIMINAL PROCEDURE § 7.2(b) (2d ed.1999), and cases cited therein; *see also Wise v. United States*, 383 F.2d at 208 (when a victim could not identify the thief by sight in a show-up, but thought she could by the sound of his voice, police ordered the suspect to speak).