Steven ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–1180.

District of Columbia Court of Appeals.

Argued April 7, 2006.

Decided July 26, 2007.

Michael L. Spekter, Washington, DC, appointed by the court, for appellant.

Vasu B. Muthyala, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the

time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, Thomas J. Tourish, Jr., Kevin F. Flynn, and Kimya I. Jones, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, KRAMER, Associate Judge and SCHWELB, Senior Judge.*

WASHINGTON, Chief Judge:

On May 16, 2002, the grand jury indicted appellant Steven Robinson for first-degree murder while armed.[1] Following a jury trial, the appellant was convicted of second-degree murder while armed as a lesser included offense of first-degree murder while armed. On appeal, the appellant argues that: (1) the trial court erred in admitting into evidence his inculpatory videotaped statement; (2) the trial court erred in failing to grant the appellant's motion for judgment of acquittal; and (3) the trial court erred in failing to strike, *sua sponte*, several alleged improper statements made by the prosecutor during closing argument. Finding no error, we affirm.

## I.

On August 7, 2001 at 11:00 p.m., officers of the Metropolitan Police Department ("MPD") responded to a call that a man was being beaten at 1706 L Street N.E., Washington, D.C. Upon arrival, officers found James Junior Osborne on the ground suffering from severe head injuries. The police also discovered a bloodied baseball bat in the alley behind the house where they found Osborne. At 11:50 p.m., doctors pronounced James Osborne ("de-

cedent") dead. A subsequent police investigation led to the appellant's arrest for the murder of James Osborne.

Alphonso Belton, appellant's cousin, accompanied the appellant to the Superior Court on the morning of his arrest. Belton claimed that the appellant asked to see his attorney as soon as the officers confronted him at the Superior Court entrance. He also stated that the detectives told the appellant that he could see his lawyer once they arrived at the station house. When the appellant asked why he was being arrested the officers replied that it was for murder, to which the appellant replied that "he knew [they] were going to get him." The appellant also stated that he had a scheduled court date for an unrelated drug charge. According to Detective Truesdale, at no point during the arrest did the appellant request his attorney in the drug case or any other attorney.

Following the arrest and arrival at the police station, Detective Truesdale placed the appellant in an interview room and secured one of his hands to the floor. The appellant was offered access to the bathroom, something to eat or drink, and cigarettes. A short time later, Detectives Truesdale and Darryl Richmond entered the interview room and began the formal interrogation of the appellant. Detective Richmond read the appellant his *Miranda* rights from a PD–47 Rights Card and the appellant responded by nodding his head in the affirmative as if he understood the meaning of his rights. When Detective Richmond asked the appellant the "waiver of rights" questions on the PD–47 card, the appellant answered yes, initialing each question. The appellant did not ask the Detectives to repeat any of the instruc-

---

* Judge SCHWELB was an Associate Judge of the court at the time this case was argued. His *status changed to* Senior Judge on June 24, 2006.

1. In violation of D.C.Code §§ 22–2101, –4502 (2001).

tions and the officers had no other indication that the appellant had difficulty understanding what was transpiring. Before signing the PD–47 card and submitting to questioning, the appellant asked Detective Truesdale if he needed a lawyer, to which Detective Truesdale responded, "I can't answer that for you, you have to make that decision on your own." The appellant then signed the PD–47 card and did not inquire about an attorney again.

Detective Truesdale asked the appellant about his involvement in the beating death of the decedent. The appellant responded that he had no part in the decedent's death, but when the detective told the appellant that he didn't believe him, the appellant relented, confessed to some culpability and consented to a videotaped recording of his statement.

## II.

### A. The Suppression Hearing

Prior to trial, appellant filed a motion to suppress a videotaped post-arrest statement he made to MPD detectives on the grounds that: (1) he invoked his right to speak with an attorney; (2) he lacked the intellectual capacity to knowingly and intelligently waive his Miranda[2] rights; and (3) there was an unreasonable and unnecessary delay from the time of the appellant's arrest to his presentment before the court.

At the pretrial suppression hearing, the government called Dr. David Shapiro to testify as an expert in forensic psychology. Dr. Shapiro testified that he interviewed the appellant on January 29, 2003. After reviewing the results of the Grisso Mi-randa Instrument ("Grisso Test"),[3] Dr. Shapiro believed that the appellant understood his Miranda rights when they were read to him based on the appellant's high score on the Grisso Test. Additionally, Dr. Shapiro testified that it was not possible for the appellant to have acquired his level of understanding of Miranda rights between the time of his arrest and administering of the test by virtue of having someone teach him.

After the government presented Dr. Shapiro's testimony, Dr. Ronald Jack Klein, a District of Columbia Correctional Treatment Facility psychologist, was called by the defense. Like Dr. Shapiro, Dr. Klein was recognized by the court as an expert in the field of clinical psychology with forensic experience. Dr. Klein testified about the results of a psychological evaluation he had performed on the appellant in his pending, but unrelated, drug case. Based on a battery of tests that he performed in that case, Dr. Klein testified that the appellant read at less than a second grade level and that he suffered from a learning disability. He also stated that the appellant scored in the second percentile on a verbal IQ test, placing him in the "high end of the mental retardation range."

The defense also called Dr. Charles Richard Filson, a private psychologist whom the court qualified as an expert in the field of forensic psychology. Dr. Filson testified that he conducted six tests in order to evaluate the cognitive ability of the appellant. Like Dr. Klein, Dr. Filson concluded that the appellant bordered "mild mental retardation" with reading,

---

2. See Miranda v. Arizona, 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.").

3. The Grisso Test was developed to evaluate an individual's ability to understand and comprehend his Miranda Rights.

spelling, and arithmetic skills at the first or second grade level. More importantly, Dr. Filson opined that the PD–47 card requires a sixth-grade level of reading and comprehension, and therefore the appellant could not have been able to read and understand the card.[4]

Dr. Filson asserted that the appellant's results on Grisso Test demonstrated an "adequate understanding and appreciation of his *Miranda* rights." Dr. Filson noted, however, that the Grisso Test demonstrated the appellant's comprehension of his Miranda rights at the time he was tested and not a year earlier when he was arrested. For that reason, Dr. Filson suggested that the results might not reflect the appellant's comprehension on the day of his arrest because the appellant could have learned about his *Miranda* rights from speaking with his attorney or from having someone in jail read him the suppression motion prepared by defense counsel. Based on this testimony, Dr. Filson concluded that the appellant was not competent to waive his *Miranda* rights and that whatever awareness he showed on the Grisso Test could be attributed to his being held in custody pending trial.

The trial court denied the motion to suppress statements and made several factual findings. First, the court discredited the testimony of Belton, noting his strong bias, and found that the appellant had not asked for an attorney when he was taken into custody.[5] The court then looked to the totality of the circumstances in determining the appellant's ability to make a knowing and intelligent waiver of his *Mi-*

*randa* rights. While finding the testimony of the experts informative, the court ruled that the videotape of his statement was the "best evidence of [the appellant's] mental condition contemporaneous with the giving of the statement and [the appellant's] level of understanding at the time." The court specifically cited a lack of coercive conduct on behalf of the detectives, that the appellant appeared comfortable, smoking a cigarette and drinking soda, and that he gave a chronological and logical narrative of the events without signs of anxiety. The court also reasoned that the appellant's use of complex vocabulary and his attempt to implicate another individual, while minimizing his own level of culpability in his videotaped statement, suggested a level of intelligence demonstrating the appellant's understanding of the gravity of the situation. The court credited Detective Truesdale's testimony stating that the appellant showed no signs of not understanding his *Miranda* rights and that the officers felt no need to repeat any of the *Miranda* warnings to him.

The court discussed the expert testimony, finding that all three doctors agreed that while the appellant likely suffered from some learning disabilities, the appellant did not have any mental illnesses. In weighing the contradicting opinions of the doctors, the court gave greater weight to those of Dr. Shapiro, emphasizing his experience evaluating the ability of subjects to competently waive their *Miranda* rights, his work with Dr. Grisso, the creator of the *Miranda* competency test, and his thirty years of conducting competence

---

4. Dr. Filson did concede on cross examination that because the *Miranda* rights were read to the appellant by the detectives that it was not relevant whether or not he could have read them.

5. The court also noted that even if the appellant had asked to speak with his attorney in

his pending drug case, that would not have "undermined the later *Miranda* warnings given to him in custody at the station because his request to see his lawyer at that point of his arrest would not have implicated his right to remain silent specifically."

evaluations for the Superior Court. In discussing Dr. Filson's testimony, the court mentioned his limited body of experience in *Miranda* competency and his failure to rely on the videotaped statement to evaluate the appellant's ability to make a knowing and intelligent waiver. The court also addressed the appellant's behavior over the course of the five day suppression hearing, finding him to have been highly attentive even during the complex expert testimony, periodically communicating with his attorney. Based on a totality of those circumstances the court had "no cause to doubt [appellant's] ability to participate knowingly in a discussion or in the waiver of his *Miranda* rights."

Lastly, the court addressed the appellant's question to the detectives, prior to signing the PD–47 card, of whether he would need an attorney. The court ruled that the question was not an unequivocal demand for an attorney and that the police were neither obligated to do more nor to discontinue questioning. The court concluded that Detective Truesdale's response indicating the appellant had to make that decision on his own was neither coercive nor misleading, thus admitting the appellant's statement.

## B. Trial

At trial, the government offered the testimony of Mark Browner, a neighbor of the decedent. Browner testified that at approximately 11 p.m. on August 7, 2001, he heard the decedent arguing with another individual whose voice he did not recognize. Browner heard the decedent say that he did not have a gun and soon after he heard several metallic banging sounds and "could tell that the porch was being hit." He called 911 and once the noises outside subsided, he opened his front door and saw the decedent badly beaten on his front porch.

Shameka Barnes, who resided with decedent and described herself as like a sister to him, also testified on behalf of the government. She stated that on the morning of the decedent's death, the appellant visited his home while the decedent was elsewhere. The appellant told Barnes that the decedent owed him $300 and if he did not pay it back, the appellant would beat him up. Upon hearing the appellant's threat, the decedent told Barnes that he would repay the debt. Later in the afternoon, two acquaintances of the decedent came over and started drinking alcohol. The decedent drank to the point of intoxication. The appellant returned to the house to speak with the decedent and Barnes overheard the two of them arguing. After the appellant left, the decedent stated that he needed a gun because he did not have the money to repay the appellant and was afraid. Sometime later, the decedent left the house with his two friends carrying an aluminum bat to go to his mother's house.

After the three left, Barnes decided to ride her bike around the neighborhood. While riding about a block away from her home, she heard a loud booming sound while one person cried and another shouted repeatedly that he wanted his money. She also heard the decedent say that he was going to produce the money and an unidentified voice say that he wanted the money immediately. Soon after, Barnes saw the appellant running through an alley with a bloody baseball bat.[6]

6. Officer Christopher Avery of the MPD testified that he discovered the bloodied bat lying in a trash can on the alley on the south side of L Street. Debra Hobson, a DNA examiner, later testified that the blood on the bat matched that of the decedent. No DNA of the appellant was matched to the bat. Edward Brannon, a fingerprint specialist, testified that

Annie Osborne, the decedent's mother, testified for the government that her son owed many debts and that she often paid them for him. She stated that her son had owed debts to the appellant before and that she had paid off such debts. On the night that he was killed, Ms. Osborne testified that her son knocked on her door but that she did not answer because she did not want to deal with her son's problems.

Dr. Constance DiAngelo, Deputy Medical Examiner with the District of Columbia Office of the Chief Medical Examiner, testified that the decedent's death was caused by blunt force trauma to his head and neck and that his injuries were consistent with being inflicted by a long narrow object like a broom handle or pool cue. She determined that there were a minimum of three impact sites, and that "significant force" had been used to strike the decedent's face. Detective Truesdale testified, recounting the events of the appellant's arrest and questioning for the jury, mirroring his testimony at the suppression hearing. The videotaped statement was also played for the jury.

The appellant took the stand and testified in his own defense. He claimed that on the evening of the decedent's murder, he left work at approximately 10:30 p.m., and went to the decedent's home to confront him about the debt. He arrived at the decedent's house to find four individuals, two of whom he recognized as "Tony" and "Alaskan Tony" and two other unknown men, beating the decedent. The appellant then stated that he saw Tony hit the decedent on the head and he fell to the ground where he lay motionless. When the appellant went to see if he was all right, the decedent lunged and grabbed the appellant by the neck. In order to

defend himself, the appellant grabbed the nearest object, an aluminum bat, and hit the decedent in the chest to get him to release his grip. Subsequently, Tony continued to beat the decedent with the bat. The appellant then took the bat back from Tony and walked away, later laying it in a nearby alley.

The appellant testified that on the morning of his arrest he immediately informed the detectives that he wished to speak with his attorney in his drug case and that he had a scheduled court appearance to attend. He stated that the detectives told him that no attorneys were allowed in the precinct. The appellant testified that he did not understand his *Miranda* rights when read to him. The appellant did admit on cross examination that he had been arrested four previous times and that authorities read him his *Miranda* rights on each of those occasions.

### III.

#### A. Knowing and Intelligent Waiver of *Miranda* Rights

The appellant's primary argument on appeal is that his videotaped confession was not made in a knowing or voluntary fashion and that the trial court committed reversible error in allowing it as evidence at trial. Appellant asserts that the trial court's admission of the statement directly contradicts this court's opinion in *Di Giovanni v. United States,* 810 A.2d 887 (D.C. 2002), and that under the totality of the circumstances test applied in that case, his *Miranda* rights were not properly waived.

 On appeal from the denial of a motion to suppress evidence, this court's scope of review is limited. *Peoples v.*

---

he was unable to find the appellant's prints on either the baseball bat or the lid of the

trash can from which the bat was recovered.

*United States,* 395 A.2d 41, 43 (D.C.1978). "This court will uphold the trial court's findings of fact and all inferences derived therefrom unless they are clearly erroneous when reviewing a suppression hearing." *Di Giovanni, supra,* 810 A.2d at 891. This court will "view the record in the light most favorable to the party that prevailed in the trial court [and] must sustain any reasonable inference that the trial judge has drawn from the evidence." *Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999) (citations omitted). "However, we review the trial court's legal conclusions [on the voluntariness of the waiver] *de novo.*" *In re M.A.C.,* 761 A.2d 32, 38 (D.C.2000) (citing *Hicks v. United States,* 705 A.2d 636, 639 (D.C.1997)).

▪▪▪ This court has interpreted the *Miranda* decision to require that the police warn a suspect of his right to have an attorney present for any statement made during custodial interrogation to be admissible against him at trial. *M.A.C., supra,* 761 A.2d at 35 (citations omitted). "[I]f, [however,] a suspect makes a reference to an attorney that is ambiguous or equivocal, in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Gresham v. United States,* 654 A.2d 871, 874 (D.C.1995). A suspect may waive his *Miranda* rights and provide a statement to the police without the presence of counsel. *M.A.C., supra,* 761 A.2d at 36. "[W]hen a defendant challenges the admissibility of such a statement, [however,] the government has the burden of proving that the waivers of privilege against self-incrimination and the right to counsel were made knowingly, intelligently, and voluntarily." *Di Giovanni, supra,* 810 A.2d at 892 (D.C. 2002) (citing *M.A.C., supra,* 761 A.2d at 36).

▪▪▪ "A waiver may be knowing and intelligent in the sense that there was awareness of the right to remain silent and a decision to forego that right." *United States v. Yunis,* 859 F.2d 953, 964 (D.C.Cir.1988); *see also Shreeves v. United States,* 395 A.2d 774, 781 (D.C.1978) (holding that "the government bears a heavy burden to show: (a) that the defendant understood that in fact he had a right to the presence of counsel during an interrogation ...; and (b) that the defendant intentionally relinquished or abandoned that 'known right' "). "In order to determine whether [appellant's] waiver of his *Miranda* rights was made knowingly, intelligently, and voluntarily, we must examine the particular facts and circumstances surrounding [his] case ... and the totality of the circumstances." *Di Giovanni, supra,* 810 A.2d at 892 (internal quotations and citations omitted). The court can consider a range of factors in determining if a suspect made a knowing and intelligent waiver of his *Miranda* rights including: prior experience with the legal system, evidence of coercion or trickery, cognitive ability of the suspect or delay between arrest and statement. *Id.* "However, 'a low I.Q., standing alone, will not render an otherwise voluntary and knowing confession inadmissible.' " *Id.* (citing *M.A.C., supra,* 761 A.2d at 38).

▪▪▪ Appellant argues that the circumstances surrounding the waiver of his Miranda rights clearly show that his waiver was neither voluntary nor intelligent, and must be suppressed. He invites this court's attention to our decision in *Di Giovanni,* where we concluded that a suspect who was wet and cold, and "appeared [to be] very slow" in the opinion of the police officer who interrogated him, had not voluntarily or intelligently waived his right to counsel. *See* 810 A.2d at 890. In *Di Giovanni,* however, the case turned

substantially on the officer's distortion of the *Miranda* warnings and on the fact that the suspect in that case had no prior experience with the criminal justice system. After reviewing the waiver questions with appellant, the officer asked if he would be willing to speak with police without an attorney present. *Id.* Di Giovanni then asked if he would need a lawyer, and the officer responded "that he would need one later, but that at that time he did not think [appellant] needed one, and that it would not be feasible to bring a lawyer into the police station." *Id.* After the questioning officer informed him that "it would be best if [he] told [his] side of the story," Di Giovanni waived his *Miranda* protections, but the officer had to fill out the waiver card because the appellant was "shaking from being wet and cold." In that case, we held that based on "Di Giovanni's low intellectual capacity, [his] physical condition, his unfamiliarity with the *Miranda* warnings, and [the officer's] embellishments," the appellant's waiver was neither knowing nor intelligent and consequently the trial court erred in admitting his statement to police. *Id.* at 894.

The facts in the instant appeal are readily distinguishable from those in *Di Giovanni.* Unlike the appellant's statements in *Di Giovanni,* the appellant's videotaped statement demonstrated a level of cognitive ability sufficient to make a knowing and intelligent waiver. Mr. Robinson never expressed any confusion while his rights were being read to him. In addition, he answered clearly in the affirmative after listening to each waiver question, and initialed the waiver card after each response. Further, and unlike the officer who questioned *Di Giovanni,* Detectives Truesdale and Richmond did not perceive the appellant to be of below-average intelligence or capacity. It is also important to note that appellant did not appear to be in any particular distress, while Di Giovanni was wet, cold, and shaky during his questioning, and could not fill out the waiver forms without assistance.

The most important distinction between this case and *Di Giovanni's* circumstances, however, is the absence of any distortion of the standard *Miranda* warnings, in this case, as compared to the officer's statement in *Di Giovanni.* This court was particularly concerned with the impact of the officer's statement to Di Giovanni that it was not feasible to bring a lawyer in and that he *did not think* the appellant *needed* a lawyer at that time. Detective Truesdale offered no such advice to Mr. Robinson and therefore, we do not find this circumstance to be as nearly as serious as the police conduct in *Di Giovanni.* Though the trial court did not especially take into account the appellant's experience with the criminal justice system, he testified that he had been arrested four times as a juvenile and on each occasion he had been read his *Miranda* rights. *See West v. United States,* 604 A.2d 422, 427 (D.C.1992) (testimony from the trial on the merits may be considered on appeal in deciding whether the motion to suppress was properly denied). The appellant's lack of confusion during questioning and the detectives' non-coercive statements and behavior make this case readily distinguishable from *Di Giovanni.*

The trial court's factual findings are significant to our consideration of whether the totality of circumstances support the appellant's contention that his waiver was neither knowing nor voluntary. The trial court made several findings of fact. First, the court found that there was a lack of coercion or duress, and that the appellant gave a coherent and logical narrative of the events. The video presented the appellant as relaxed, not anxious or distressed and under no pressure. The court found that the appellant had the ability to

understand complex words and discuss comparative blame and responsibility and that his grasp of these concepts were indicative of his intelligence and understanding of his situation. Our review of the videotaped statement leads us to conclude, much as the trial court did, that the appellant made a voluntary, knowing and intelligent waiver of his right to counsel, and that it was well within the discretion of the trial court to give the videotaped evidence appropriate weight. *Freeman v. United States,* 912 A.2d 1213, 1218–19 (D.C.2006).

In addition to the appellant's apparent understanding of the *Miranda* warning, he scored at a very high level on the Grisso test and achieved a perfect score on a subtest of the Grisso test that measures basic comprehension of *Miranda* rights. Although the Grisso test could not measure appellant's comprehension of the *Miranda* rights at the time they were given, according to Dr. Filson, it is unlikely that appellant could have learned enough about his rights protected by *Miranda* and perform as well as he did on the test. If the appellant was indeed suffering from a cognitive impairment, it would have been "impossible" for him to do so well on the test by reading a motion about *Miranda* rights, or by speaking with others in jail pending trial. Therefore, based on the totality of the circumstances, we are satisfied that the appellant made a voluntary, knowing and intelligent waiver of his *Miranda* rights. 810 A.2d at 892.

## B. Motions for Judgment of Acquittal

Appellant also argues that the trial court committed reversible error by failing to grant his motion for judgment of acquittal. Specifically, the appellant asserts that the government's case was based in large part on the testimony of Barnes, an unreliable and biased witness, and therefore the evidence was insufficient to find him guilty. We disagree.

Barnes' testimony on behalf of the government was certainly key to appellant's conviction. Her testimony is highly probative on the issue of the identity and intent of the assailant and was evidence from which a jury could make a reasonable inference that the appellant had a motive for assaulting the decedent and that appellant actually committed the beating that caused the decedent's death.

 In this appeal, appellant asks us to substitute our judgment regarding Barnes' credibility for that of the jury, arguing that because Barnes was a drug abuser, and because she was not in a position to witness the events about which she testified; therefore, according to appellant, her testimony was incredible. However, this court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness. That determination is for the fact-finder to make and is made in large part, based on factors that can only be ascertained after observing the witness testify. *See Lee v. United States,* 668 A.2d 822, 833 n. 26 (D.C.1995) (noting that this court is in "no position to second-guess, on the basis of a paper record, a credibility determination by a trier of fact who was in the courtroom."); *see also Bouknight v. United States,* 867 A.2d 245, 251 (D.C. 2005) ("The determination of credibility is for the finder of fact, and is entitled to substantial deference."). The one exception to this general rule is if the testimony of a witness is inherently incredible under the circumstances. *See Payne v. United States,* 516 A.2d 484, 494 (D.C.1986) (discussing that the "doctrine of inherent incredibility can be invoked only when the testimony can be disproved as a matter of logic by the uncontradicted facts or by scientific evidence, or when the person

whose testimony is under scrutiny made allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.") (internal quotations and citation omitted). Because there is nothing inherently incredible about Barnes' testimony here, and the jury was well aware of her drug use when it made its findings and assessed Barnes' credibility, there is no basis for substituting our judgment on credibility for that of the jurors who observed Barnes testify. *See McCoy v. United States*, 781 A.2d 765, 769 n. 3 (D.C. 2001). Our role is limited to ensuring that there is sufficient evidence in the record, from which a juror could conclude guilt beyond a reasonable doubt based on all of the evidence presented at trial. Therefore, our review of the sufficiency of the evidence will include the evidence presented by Ms. Barnes as well as all of the other evidence presented in the case.[7]

 When reviewing a claim challenging the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the government, recognizing [that it is within] the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." *Dickerson v. United States*, 650 A.2d 680, 683 (D.C.1994); *see also Gibson v. United States*, 792 A.2d 1059, 1065 (D.C.2002). While the government "must present 'at least some probative evidence on each of the essential elements of the crime,'" *Price v. United States*, 746 A.2d 896, 899 (D.C.2000) (quoting *Robinson v. United*

*States*, 506 A.2d 572, 573 (D.C.1986)), "[i]t is not necessary that the government's evidence compel a finding of guilt beyond a reasonable doubt, nor that the government negate every possible inference of innocence." *Timberlake v. United States*, 758 A.2d 978, 980 (D.C.2000) (citing *Bullock v. United States*, 709 A.2d 87, 93 (D.C.1998)). "In recognizing the jury's role in weighing the evidence, [this court] will defer to its credibility determinations, as well as its ability to draw justifiable inferences of fact." *Johnson v. United States*, 756 A.2d 458, 461 (D.C.2000).

 In order to show that a defendant committed second-degree murder while armed, the government must prove three elements beyond a reasonable doubt: (1) the defendant caused the death of the victim; (2) the defendant had the specific intent to kill or commit serious bodily injury on the victim, or acted with conscious disregard or with an extreme risk of death or serious bodily injury to the decedent; and (3) there were no mitigating circumstances. *Williams v. United States*, 858 A.2d 984, 993 n. 11 (D.C.2004).

 In this case, evidence was presented that the appellant threatened to hurt the decedent if he failed to pay a debt that he owed to the appellant. Later on the same day, the appellant confronted the decedent about the debt and frightened the decedent into carrying a bat for protection. Sometime later that same day, the decedent was overheard crying while money was being demanded from him, and shortly thereafter, the appellant was seen running away from the murder scene with a bat that was found to have the decedent's blood on it. There was also evi-

---

7. Appellant also argues that Barnes' testimony was unreliable because she could not have seen what she claims to have seen from her vantage point on the night of the offense. However, there appears to be no support in the record for this contention beyond appellant's mere conjecture. In fact, appellant's own videotaped-statement to the police suggests the contrary.

dence that the decedent's death was caused by "blunt impact, head and neck trauma," an injury that was consistent with the type of injury that would have been inflicted by a long and linear object such as a bat. Therefore, viewing the evidence in the light most favorable to the government, the evidence was sufficient to sustain the appellant's conviction of second-degree murder while armed.[8]

For the foregoing reasons, the decision of the Superior Court is

*Affirmed.*

8. Finally, the appellant contends that the prosecutor's closing argument was improper and requires reversal of his conviction. During closing argument, the prosecutor stated:

If you see Mr. Osborne lying on that, that front porch, you see him lying there with this supposed death grip, easiest grip in the world to get out—I mean can you imagine—*try it at home, have somebody lie down, reach up,* even if that's the truth, it's far-fetched that anybody would feel as if they were in imminent danger of bodily harm on those facts, which we submit, by the way, based on all the evidence was not what happened, but let's just give the benefit of the doubt for the moment.

Here, no objection was raised at trial, so we review the appellant's contention under a plain error standard. *See United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In other words, appellant must show that the trial court plainly erred by failing to intervene *sua sponte. Irick v. United States,* 565 A.2d 26, 30 (D.C. 1989). Here, the error complained of was neither plain nor obvious for the prosecutor's comment went merely to appellant's credibility. *See Thacker v. United States,* 599 A.2d 52, 61–62 (D.C.1991) (holding that the trial court's failure to interject itself *sua sponte* to a challenge to the appellant's credibility during closing argument did not rise to the level of plain error). For that reason, the appellant has failed to meet his burden of showing trial court error sufficient to warrant reversal.