*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0184

TIAQUANA CHANDLER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF3-001910)

(Hon. Sean C. Staples, Trial Judge)

(Argued October 23, 2025                    Decided January 29, 2026)

*Adrian E. Madsen* for appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Edward R. Martin, Jr.*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, Assistant United States Attorney, were on the brief, for appellee.

Before EASTERLY, DEAHL, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In March 2023, Shawn Watts was assaulted and shot in the leg in the stairwell of an apartment building in Southeast, Washington, D.C. Appellant Tiaquana Chandler and her son, Donnell Tucker, were together charged with conspiracy to commit assault with a dangerous weapon, first-degree burglary while armed, aggravated assault while armed (AAWA), assault with

significant bodily injury, and two counts of possession of a firearm during a crime of violence (PFCV).  Ms. Chandler was separately charged with soliciting a crime of violence.  After the cases were severed and went to trial, a jury convicted Ms. Chandler on three counts: conspiracy to commit assault with a dangerous weapon, AAWA, and PFCV.  Ms. Chandler appeals these convictions on four grounds.

First, Ms. Chandler challenges on sufficiency grounds her conviction for PFCV and the "while armed" enhancement for her aggravated assault conviction, both of which rested on an aiding-and-abetting theory of liability.  We conclude that there was sufficient evidence to sustain Ms. Chandler's "while armed" enhancement for aggravated assault but insufficient evidence to support her conviction for PFCV.  We therefore affirm Ms. Chandler's AAWA conviction and reverse her PFCV conviction.

Second and third, Ms. Chandler contends that the trial court erred in its handling of the testimony of two witnesses: Mr. Watts and an eyewitness whom, for reasons that will become clear below, we will refer to by the initials H.J.  As to Mr. Watts, she argues that the trial court abused its discretion when it declined to compel him to submit to a drug test based on his demeanor during his testimony.  As to H.J., she asserts that the trial court's failure to conduct a competency voir dire or take further steps to learn about the impact of H.J.'s mental conditions on her testimony

violated Ms. Chandler's Sixth Amendment right to confrontation or was an abuse of discretion. We conclude that the trial court was within its discretion in denying Ms. Chandler's request to drug test Mr. Watts. As to H.J.'s testimony, we see no Sixth Amendment error because Ms. Chandler was fully able to cross-examine H.J. regarding her competency. We assume without deciding that the trial court abused its discretion in denying a competency voir dire and the subpoena request but conclude that the assumed error was harmless.

Fourth, Ms. Chandler contends that the trial court misstated the law in response to a jury note that sought guidance on the law of aiding and abetting as applied to PFCV. Because we otherwise identify reversible error on the PFCV issue, we decline to reach this issue.

## I. Factual and Procedural History

### A. The Assault

In the hours leading up to the assault of Mr. Watts, Ms. Chandler had spent the evening "drinking beers and chilling" with a small group—including Mr. Watts and his romantic partner at the time, H.J.—at a friend's apartment in Southeast, Washington, D.C. At one point during the night, an argument between Ms. Chandler and Mr. Watts escalated into an altercation, culminating in Mr. Watts directing Ms.

Chandler to leave the apartment.[1]  Soon after, the gathering dispersed and H.J. settled in the living room while Mr. Watts went to take out the trash from the kitchen.  H.J. then heard a knock at the door and, when she got up and peered through the peephole, she saw Ms. Chandler and her son, Mr. Tucker, who was wearing a mask and carrying a gun.  According to H.J., Mr. Tucker pushed his way in through the unlocked door, slamming her against the wall in the process.[2]

Once in the apartment, Mr. Tucker confronted Mr. Watts, shouting at him, "Why you hit my mom?  You shouldn't hit her.  I'm going to kill you right now."  Ms. Chandler joined in, threatening Mr. Watts that she was "going to beat [him] up" and "going to kill [him]."  Mr. Tucker then grabbed Mr. Watts by his feet[3] and pulled him into the hallway, where Mr. Tucker and Ms. Chandler began to beat him.  They struck him repeatedly in the face and head, with Ms. Chandler's ring creating deep

---

[1] There is conflicting testimony as to whether this altercation turned physical. H.J. testified that Ms. Chandler struck Mr. Watts "on his eye," after which Mr. Watts "hit her back, . . . [threw] the cup of the ice to the wall, and [took] off her wig."  Mr. Watts testified only that he became "a little uncomfortable" because Ms. Chandler was "staying [in the apartment] for a long time . . . [and] didn't want to go home." He denied that he ever touched her or that the confrontation became physical.

[2] Mr. Watts testified that he went to answer the door, saw Ms. Chandler and Mr. Tucker through the peephole, and opened the door for them.  This inconsistency in the testimony is not material to the issues on appeal.

[3] H.J.'s testimony was unclear but a reasonable inference from it was that Mr. Watts was on the ground and Mr. Tucker pulled him into the hallway by his feet.

gashes on the top of his skull. Mr. Tucker then threatened to kill Mr. Watts once more and shot him in the leg before fleeing the scene with Ms. Chandler.

A neighbor called 911 around midnight to report a shooting, and the two Metropolitan Police Department (MPD) officers who responded found a screaming Mr. Watts in the building's stairwell, "covered in blood, in a very awkward, unnatural-looking position." The officers attempted to render immediate medical aid and moved Mr. Watts off the stairs to a nearby landing. EMTs then arrived and took Mr. Watts to George Washington Medical Center, where he received treatment for his injuries, including surgery to repair his broken femur and staples to close the wounds on his head and face.

## B.     The Investigation

When MPD detectives interviewed Mr. Watts at the hospital, he told them that Ms. Chandler and her son attacked and shot him. Investigators applied for and obtained an emergency search warrant for the apartment. While executing the warrant, detectives encountered H.J., whom they interviewed on the scene and then again at the police station. H.J. told the police that Ms. Chandler and her son attacked Mr. Watts, and she identified Ms. Chandler via a confirmation photograph, stating that she saw Ms. Chandler "beat and assault [Mr. Watts]." Several days later, Mr. Watts reaffirmed his identification of Ms. Chandler via a confirmation photo,

telling a detective that "she had attacked him in the hallway" when he answered the door.

Two days after the assault, Ms. Chandler was stopped by police in connection with an unrelated matter and taken to a station. There, she waived her *Miranda* rights and spoke to two detectives about the assault of Mr. Watts. Describing the events of that evening, Ms. Chandler told the detectives that Mr. Watts, high on PCP, had "choked [her] out" twice, once outside the apartment complex by the dumpsters and once again inside the apartment while she and a few others, including Mr. Watts, were smoking weed and PCP. The second time, a woman named Wanda intervened to help her and then Ms. Chandler left the apartment to find someone to beat up Mr. Watts for her in retaliation.[4]

According to Ms. Chandler, she and the man she recruited as her accomplice returned to the apartment complex, and Mr. Watts came out into the hallway. Her accomplice then began "pistol-whip[ping]" Mr. Watts, and she joined in the attack, beating him with her fists. Despite her repeated descriptions of the assault as a pistol-whipping, Ms. Chandler simultaneously maintained that she never saw a gun

---

[4] Mr. Tucker, Ms. Chandler's son, was charged as her co-conspirator and co-assailant. During her interview, Ms. Chandler never disclosed her accomplice's identity and repeatedly denied that it was her son.

and never saw or heard any shooting. At the end of the interview, Ms. Chandler was placed under arrest for assault with intent to kill.

Surveillance footage of the exterior of the building obtained by detectives showed a car driving up and parking in front of the building shortly after midnight on the night of the attack. An individual got out of the driver's seat and walked into the building. Several minutes later, loud noises and raised voices can be heard coming from inside the building, followed quickly by the sound of a gunshot and someone screaming. Two shadowy figures then fled the building and, as the second person neared the car, a male voice called out, "Hey! Get my clip." The second person stopped and went back to the building as the male voice continued, "Go get my clip, hurry up. It's over in the corner." A female voice asked, "Where?," to which the male voice responded, "By the window. Go in there to the left. Hurry up, *hurry up*." Less than two minutes later, the second person re-emerged from the building, got in the car, and drove away. Officers responded to the scene approximately six minutes later.

While awaiting trial, Ms. Chandler made several phone calls from jail that the government later introduced at trial. On some of these calls, Ms. Chandler discussed details of the assault. For example, on March 30, she spoke with her father, explaining that after Mr. Watts had "choked [her] out," she and her son "went

around" to the apartment where Mr. Watts was staying and "Donnell pistol whipped [Mr. Watts]." A few days later, on April 4, Ms. Chandler spoke with her significant other about the assault. She told him that Mr. Watts had "strangled" her and that she "react[ed] . . . [and] ran, got such-and-such." Describing the assault that followed, she explained that while she and "such-and-such" were "fuckin' [Mr. Watts's] ass up," "that thing came out, beatin' on him, the clip came out, and [she] just had to run in there and grab his thing."

## C. Trial

At trial, the government put on eight witnesses and introduced photographic evidence of Mr. Watts's injuries, surveillance footage, and the recordings of Ms. Chandler's custodial interview and jail calls. The testimony of two witnesses—H.J. and Mr. Watts—is at issue on appeal.

### 1. H.J.'s Testimony

On the morning of H.J.'s testimony, the government disclosed that it had just learned that H.J. was voluntarily staying at a "crisis facility" in Virginia to help her "deal with the difficulties that [she had] been having with her life," including domestic violence, homelessness, and prior substance abuse. The government also told the court that facility staff had informed the government that, prior to her arrival

at the facility, H.J. had been diagnosed with "[a] form of Down syndrome, PTSD, and . . . a borderline intellectual disability."[5] Nevertheless, the staff described H.J. as "high-functioning" and capable of independent living. Prosecutors assured the court that their own discussions with H.J. that morning confirmed that she was "able to respond to [ ] questions and understand them" and carry on a "coherent discussion," despite some "points of confusion."

In light of the government's disclosures, Ms. Chandler expressed concern about H.J.'s ability to competently testify and asked the trial court to conduct a competency voir dire outside the presence of the jury. Initially, the trial court indicated that it was inclined to grant the request, but after a short recess, the court questioned whether its "initial instincts were correct." The court asked Ms. Chandler why—considering the government's proffer that H.J. entered the crisis facility voluntarily, provided comprehensible testimony to the grand jury, and recounted her testimony when reviewing it with prosecutors that morning—it should allow a competency voir dire given the "low threshold" for witness competency. Ms. Chandler explained that several parts of H.J.'s grand jury testimony were problematic, citing instances in which her memory of the timing of certain events

---

[5] The government had disclosed this information to defense counsel before appearing in court that morning.

differed from that of other witnesses, her paradoxical characterization of her relationship with Mr. Watts as "like fianc[é]es" but not "engaged to be married," and moments when her testimony seemed "childlike in a way."

Citing H.J.'s "intelligible" grand jury testimony, the trial court found that Ms. Chandler had not made a threshold showing that a competency voir dire was necessary and denied her request. The court stated, however, that Ms. Chandler would be permitted to cross-examine H.J. on these issues. Ms. Chandler then asked the court to issue a subpoena for H.J.'s records from the crisis facility. The trial court denied this request, stating that it was unclear whether the records were relevant to H.J.'s ability to testify, and again told Ms. Chandler that she was free to explore these issues on cross-examination.

### 2. *Mr. Watts's Testimony*

After H.J. testified, the government called Mr. Watts. Following direct examination, and outside the presence of the jury, counsel for Ms. Chandler asked the court to send Mr. Watts "down for a drug test" because it "look[ed] like he may have imbibed in a substance of some type" and he was "slurring his words." The trial court acknowledged that Mr. Watts was "speaking rather slowly and deliberately," but it noted that Mr. Watts had "suffered significant injuries" and had not "admitted [to] doing anything." The government proffered that Mr. Watts had

"steadfastly" denied that he was under the influence of anything when the government asked him earlier that day and that his demeanor on the stand was "pretty much" the same as it had been in conversations prior to his grand jury testimony. The court denied Ms. Chandler's request, observing that, although Mr. Watts's testimony displayed some irregularities, there was nothing about his demeanor on the stand that would compel the court to order a drug test. On cross-examination, Mr. Watts denied being under the influence of any substances.

### 3. The Verdict

The jury returned a split verdict, finding Ms. Chandler guilty of one count of conspiracy to commit assault with a deadly weapon, one count of AAWA, and one count of PFCV, and acquitting her of the remaining counts. The trial court sentenced Ms. Chandler to a total of 72 months of imprisonment to be followed by five years of supervised release.

This appeal followed.

## II. Analysis

Ms. Chandler raises four claims on appeal: (1) that the evidence was insufficient to support her conviction for PFCV and the "while armed" enhancement to her aggravated assault charge on aiding-and-abetting theories of liability; (2) that

the trial court erred by refusing to drug test Mr. Watts in light of his suspect testimonial demeanor; (3) that the trial court erred in violation of her confrontation rights or abused its discretion by declining to conduct a competency voir dire of H.J. following the revelation of information about her mental capacity and by denying her request to subpoena records from the crisis facility where H.J. was staying; and (4) that the trial court misstated the law in response to a jury note regarding the law of aiding and abetting as applied to PFCV. We address the first three claims in turn, but because we conclude that the evidence was insufficient to support the PFCV conviction, we need not reach Ms. Chandler's fourth claim.

### A.    Sufficiency of the Evidence

Ms. Chandler raises two distinct sufficiency challenges. She contends that no reasonable jury could have, under an aiding-and-abetting theory of liability, (1) found her guilty of PFCV or (2) found the "while armed" enhancement applicable to her aggravated assault conviction.

We review claims of insufficient evidence de novo, considering "the evidence in the light most favorable to the government [and] giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, making no distinction between direct and circumstantial evidence." *Sanders v. United States*, 330 A.3d 1013, 1032 (D.C. 2025) (citation

modified). We consider all admitted evidence when conducting a sufficiency review, regardless of whether it was admitted erroneously. *See Ransom v. United States*, 322 A.3d 521, 527 (D.C. 2024). We affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (internal quotation marks omitted).

### 1.    PFCV

At trial, the government proceeded solely on a theory of aiding-and-abetting liability as to Ms. Chandler's PFCV charge. To convict someone of PFCV under an aiding-and-abetting theory, the government must "'prove some act on the defendant's part that assisted the principal in his possession of firearms,' undertaken 'with guilty knowledge.'" *Parker v. United States*, 298 A.3d 785, 791 (D.C. 2023) (citing *Tann v. United States*, 127 A.3d 400, 431, 438-39 (D.C. 2015)) (citation modified). "A jury cannot reasonably conclude that an unarmed assailant has taken 'affirmative steps to aid [her accomplices] in *their possession* of firearms,' even when they have physically subdued a person—absent some evidence that the person subdued posed a threat of otherwise disarming the gunman." *Id*. at 793 (citation modified). Such evidence is probative of the defendant's "guilty knowledge"; i.e., the risk that the victim would disarm the gunman is what motivates the defendant to

act to help the principal possess, or continue to possess, the firearm. *See id.* at 791. For criminal liability to attach, that "aid must be deliberate, not accidental." *Id.* (citing *Walker v. United States*, 167 A.3d 1191, 1201-02 (D.C. 2017)).

The evidence at trial established that Mr. Watts was beaten brutally in the head and face almost immediately after opening the door to the apartment, circumstances that hardly afforded him the chance to think about disarming Mr. Tucker, let alone make a serious attempt. Mr. Watts characterized the assault as instantaneous, testifying that he "sustained head injuries when [he] answered the door." Similarly, in her custodial interview, Ms. Chandler told detectives that, upon arriving back at the apartment, her accomplice began "pistol-whip[ping]" Mr. Watts and she then joined in the attack, beating him in the head so hard that she left deep cuts in his scalp with the ring she was wearing. There is no evidence in the record that Mr. Watts was anything other than submissive during the assault; he did not testify that he struggled, fought back, or tried to wrest the gun from Mr. Tucker. Instead, he testified to a simultaneous, two-on-one attack that rendered him helpless as soon as he opened the door.

Acknowledging the lack of direct evidence that Mr. Watts posed a serious threat of disarming Mr. Tucker, the government contends that such evidence is not required where circumstantial evidence supplies the basis for a reasonable inference

that he would have posed such a threat had he not been subdued. *See Parker*, 298 A.3d at 792-93 (characterizing our holding in *Tann*). The government argues that, because Mr. Watts had previously used force to remove Ms. Chandler from the apartment, the jury could reasonably infer that Ms. Chandler's participation in the beating hindered his ability to use force again to disarm Mr. Tucker. For support, the government relies on H.J.'s testimony that Mr. Watts used force to remove Ms. Chandler from the apartment, Ms. Chandler's statements during her custodial interview that Mr. Watts had "violently chok[ed] her" earlier that day, and Ms. Chandler's account (supported by testimony from H.J.) that Mr. Watts had been using PCP that day, which made him abnormally strong.

These facts, the government contends, gave the jury good reason to think that Mr. Watts posed a threat of disarming Mr. Tucker, making this case like *Tann*. There, we upheld a PFCV conviction where Mr. Tann complied with his co-conspirator Mr. Cooper's instruction to rob Mr. Queen, a member of a rival gang, as Mr. Cooper held another member of Mr. Queen's gang, Mr. Jones, at gunpoint. *See Tann*, 127 A.3d at 431-32. We concluded that because Mr. Tann prevented Mr. Queen from coming to the aid of Mr. Jones—something Mr. Queen was otherwise "in a position" to do—Mr. Tann assisted Mr. Cooper in maintaining possession of his firearm. *Id.*

Although *Tann* does not discuss whether Mr. Queen had in fact attempted to help Mr. Jones, we observed in *Parker* that there was "strong reason to think he would have done so had he not been subdued." 298 A.3d at 792. We cited the fact that Mr. Queen and Mr. Jones belonged to a rival gang that had "affronted the territory of [Mr. Tann and Mr. Cooper's gang] by confronting [one of their] fellow gang member[s] . . . on [their] turf" and were believed to "ha[ve] territorial aspirations adverse to the interests of [Mr. Tann, Mr. Cooper,] and their associates." *Id.* (quoting *Tann*, 127 A.3d at 426). The context of this feud, we held, suggested that Mr. "Queen was quite likely to come to his friend's aid had he not been subdued" and "suppl[ied] the necessary evidence to convict [Mr.] Tann of PFCV under an aiding and abetting theory" of liability. *Id.*

Given the facts presented in this case, we do not find the government's analogy to *Tann* convincing. The single precipitating altercation between Mr. Watts and Ms. Chandler that the government points to is not equivalent to the situation in *Tann*. There, Mr. Queen was held at gunpoint, a precarious situation for all parties: for Mr. Queen, the captive, there was a risk that a single stray move could be misinterpreted as an attempt to flee or disarm the gunman; and for Mr. Tann, the captor, there was a risk that Mr. Queen would attempt to attack and disarm Mr. Cooper. Here, Mr. Watts was attacked immediately; there was no intermediate

period in which he had a gun pointed at him but was otherwise free to act that would have given rise to the same precarity as in *Tann*.

Moreover, in *Tann* we relied on more than just Mr. Tann's striking Mr. Queen to establish aiding-and-abetting liability. We explained that Mr. Tann "patt[ed] Queen's pockets" to disarm him, robbed him, and "ultimately sho[t] Queen as he ran to safety," in addition to "striking" him. 127 A.3d at 432. Together, the fact that Mr. Tann patted Mr. Queen's pockets, robbed him, and shot him as he ran away were the facts most probative of Mr. Tann's guilty knowledge because those acts suggested an attempt to deprive Mr. Queen of access to any weapons and prevent him from calling for help. Ultimately, it is not simply that the inherently volatile context of holding a rival gang member at gunpoint is distinguishable from the assault here; it is also that Mr. Tann's acts, taken together, revealed his intent to aid Mr. Cooper's possession of the gun in a way that Ms. Chandler's acts do not.

Rather than mirroring *Tann*, we think that the facts here are more like those in *Parker*. There, Mr. Parker and an unidentified accomplice approached a couple walking down a dimly lit street to rob them. *Parker*, 298 A.3d at 787. Splitting the couple up, an unarmed Mr. Parker focused on Mr. Stepp, ordering him to "get on the ground," while his accomplice robbed the other victim at gunpoint. *Id*. at 787-88, 792-93. Unlike in *Tann*, Mr. Stepp, did not need to be physically subdued during

the robbery; he complied with the unarmed Mr. Parker's "directive that he 'get on the ground' [followed by] a few light slaps on the back of the head." *Id*. at 793. Mr. Stepp also made no move to go to his friend's aid, giving Mr. Parker "no reason to think [the victim] would try to disarm his [armed] accomplice." *Id*. We reversed Mr. Parker's PFCV conviction because there was "no evidence that [the victim] was likely to interfere with the armed robber's possession of his weapon had he not been subdued." 298 A.3d at 792.

The fact that Mr. Watts was beaten brutally in the head at the beginning of the assault and thus immediately subdued leads us to similarly conclude that he gave Ms. Chandler no reason to think that he would attempt to disarm her son. Because there was no evidence that Mr. Watts posed a threat of disarming Mr. Tucker during the assault, there is no reason to conclude that any of Ms. Chandler's actions during the assault were undertaken with the requisite "guilty knowledge" that she was helping her son maintain possession of his gun. *See Parker*, 298 A.3d at 791. We therefore hold that the evidence was insufficient to support her PFCV conviction under an aiding-and-abetting theory of liability and reverse that conviction.[6]

---

[6] Even if Mr. Watts had posed a viable threat of disarming Mr. Tucker, absent some evidence that Ms. Chandler took "deliberate" actions to quash that threat such as moving to block him from grabbing the gun or otherwise forcibly subduing him, she would not be liable for aiding-and-abetting PFCV. *See Parker*, 298 A.3d at 791,

### 2. *"While Armed" Enhancement*

To convict Ms. Chandler of the "while armed" enhancement to her aggravated assault conviction under an aiding-and-abetting theory, the government was required to prove that she "*knew in advance* that [her] associate was armed with a gun— enabling the defendant to 'make the relevant (and indeed, moral) choice' to aid and abet an armed offense." *Parker*, 298 A.3d at 793 (emphasis in original) (citation modified). "'[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from [her] failure to object or withdraw that [she] had such knowledge,' but only if [she] learned of the gun early enough to have a 'realistic opportunity to quit the crime.'" *Id.* (citing *Rosemond v. United States*, 572 U.S. 65, 78 & n.9 (2014)).

We conclude that a reasonable jury could have found that Ms. Chandler knew that Mr. Tucker had a gun at least as early as the beginning of the assault, presenting her with a "realistic opportunity to quit the crime." *See id.* During her custodial interview, Ms. Chandler told detectives that her hired accomplice began the assault

---

793. The mere fact of Ms. Chandler's participation in the "larger scheme" of assault alone is insufficient evidence to sustain her conviction on an aiding-and-abetting theory of liability. *See McCoy v. United States*, 760 A.2d 164, 186 (D.C. 2000); *see also Lancaster v. United States*, 975 A.2d 168, 175-76 (D.C. 2009) (relying on *McCoy* in deeming government's reliance on defendant's "participation in the 'larger scheme' of the armed robbery" insufficient to support PFCV conviction on an aiding-and-abetting theory of liability).

on Mr. Watts by "pistol-whipping" him and that she then joined him in the attack, "g[etting] [her] licks in." Calls she made while in jail also support the inference that Ms. Chandler continued to assault Mr. Watts while her accomplice pistol-whipped him. On March 30, Ms. Chandler recounted the assault to her father, explaining that "Donnell pistol whipped" Mr. Watts. And on April 4, Ms. Chandler admitted on a call with her significant other that while she and Mr. Tucker were assaulting Mr. Watts, "that thing came out . . . the clip came out."

The fact that Ms. Chandler tried to walk back this characterization of the assault several times, claiming she never saw or heard any shooting, does not alter our conclusion for two reasons. First, even if she had "stepped off" before shots were fired, Ms. Chandler had a fair and realistic opportunity to quit the crime at that point, at least by not further advancing it through affirmatively hitting Mr. Watts herself. If foreknowledge of a firearm with a realistic opportunity to quit the crime is sufficient to uphold a "while-armed" enhancement under an aiding-and-abetting theory, that same foreknowledge followed by the abettor's affirmative assistance in the commission of the crime surely is as well.

Second, having "full discretion to make credibility determinations," the jury could have permissibly credited Ms. Chandler's earlier admission that she knew Mr. Tucker was pistol-whipping Mr. Watts before she joined in on the assault and not

credited her later denials that she knew he had a gun or that a gun was used. *See Sanders v. United States*, 330 A.3d 1013, 1034 (D.C. 2025) (citing *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007) ("[T]his court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness.")). Because Mr. Watts's injuries, witness testimony, and video surveillance footage all confirm that a gun was present and fired at some point during the assault, the jury's decision to discredit Ms. Chandler's claims to the contrary was reasonable. *See Carrington v. United States*, 344 A.3d 663, 669 (D.C. 2025) (explaining that jury's credibility determinations warrant substantial deference unless witness testimony is "inherently incredible under the circumstances" (citing *Robinson*, 928 A.2d at 727)).

Ms. Chandler's assertion that she did not know prior to the start of the assault that Mr. Tucker was armed does not persuade us otherwise. She argues that the only evidence suggesting that she had the requisite advanced knowledge was H.J.'s testimony that Mr. Tucker was openly carrying a gun when he and Ms. Chandler arrived at the apartment and contends that this testimony warrants the exact opposite inference because Mr. Tucker was standing *behind* Ms. Chandler and she presumably could not see behind her. Ms. Chandler also points to her acquittal on the solicitation charge, concluding that this shows that the jury found she did not know her son was armed in advance of the assault.

Her arguments fail for two reasons. First, the jury permissibly inferred from her continued participation in the assault, after the gun was displayed or used, that she had the required knowledge "in advance." *See Parker*, 298 A.3d at 793. Second, the jury's acquittal on the solicitation charge is not inconsistent with this inference. The jury was instructed that, to convict Ms. Chandler on the solicitation charge, it had to find that she "request[ed], command[ed], or attempt[ed] to persuade" her accomplice to "commit assault with a dangerous weapon." A finding that Ms. Chandler did not "request, command, or attempt to persuade" her accomplice to use a firearm in the hours leading up to the assault does not necessarily foreclose a finding that she nonetheless knew the accomplice was armed "in advance."

For the above reasons, we conclude that the government presented sufficient evidence to support the "while armed" enhancement to Ms. Chandler's conviction for aggravated assault. *See Rivas*, 783 A.2d at 134.

### B.     Testimonial Issues

Ms. Chandler argues that the trial court erred with respect to the testimony of two key witnesses: Mr. Watts and H.J. As to Mr. Watts, she contends that the trial court abused its discretion in denying her request that he submit to a drug test based on his demeanor on the stand. As to H.J., she asserts that the trial court's failure to conduct a competency voir dire or grant a subpoena for relevant records upon

learning of H.J.'s stay at a crisis facility and mental disability diagnoses violated her Sixth Amendment right to confrontation or was an abuse of discretion.

We hold that the trial court was within its discretion in declining to compel Mr. Watts to undergo a drug test. As to H.J., we see no constitutional error. We assume without deciding that the trial court abused its discretion in denying a competency voir dire and the subpoena request and conclude that the error was harmless because, even if we excised H.J.'s testimony entirely, we see no reasonable probability that the result here would have been different.

### 1. Mr. Watts

Ms. Chandler argues that the trial court's refusal to compel Mr. Watts to submit to a drug test in the middle of his testimony significantly affected the jury's ability to assess his credibility as a witness. She asserts that Mr. Watts's demeanor on the stand—marked by slurred speech, nonresponsive answers, difficulty recalling some details, and a slow and deliberate cadence—coupled with his prior PCP usage raised concerns about his credibility that should have been explored and resolved via a drug test prior to cross-examination.

"The decision whether to order a physical or psychiatric examination for the purpose of determining competency to testify or to aid the jury in its assessment of

a witness'[s] credibility is within the sound discretion of the trial judge." *Hilton v. United States*, 435 A.2d 383, 387 (D.C. 1981) (collecting cases). When determining whether a physical examination like a drug test is necessary, a court must weigh the "potential evidentiary advantage" against "the dangers of an unwarranted invasion of privacy" posed by such an examination, including "the potential harassment resulting therefrom or the likelihood that the witness may be deterred from coming forward." *Id*. Because physical and psychiatric examinations have the potential to "seriously impinge on a witness'[s] right to privacy," the "presumption against ordering an examination must be overcome by a showing of need." *United States v. Butler*, 481 F.2d 531, 534 (D.C. Cir. 1973). We review such decisions for abuse of discretion. *Hilton*, 435 A.2d at 388.

We have not previously opined on the circumstances that would *permit* a trial court to order that a witness be drug-tested; in fact, we have declined to reach the question. *See In re Scott*, 517 A.2d 310, 313 (D.C. 1986); *Bethard v. District of Columbia*, 650 A.2d 651, 652 n.4 (D.C. 1994) (noting that this court declined in *In re Scott* to reach the question whether order for drug test was proper based on the trial court's observations of witness demeanor). We decline to address the question again here because the court was within its discretion in *denying* Ms. Chandler's request to drug test Mr. Watts during trial.

Ms. Chandler's argument is that drug use by Mr. Watts would have been relevant to an assessment of his credibility. That is true. Given the presumption against ordering physical or psychiatric examinations of witnesses, however, the trial court was within its discretion in declining her request and instead directing Ms. Chandler to first use cross-examination to question Mr. Watts about his drug use. *See Hilton*, 435 A.2d at 387; *United States v. Anderson*, 881 F.2d 1128, 1141-42 (D.C. Cir. 1989). As the trial court recognized, Ms. Chandler was then free to renew her request if she still believed a physical examination was necessary to ensure the jury would be able to assess Mr. Watts's credibility based on any drug use. *See Hilton*, 435 A.2d at 387 (noting that counsel did not renew their motion for examination after the witness testified). On cross-examination, Ms. Chandler questioned Mr. Watts about his prior PCP usage and asked him directly if he was "on any substances" that day, putting his drug use (past and potentially current) squarely before the jury. She did not renew her request for the court to compel Mr. Watts to submit to a drug test.

Turning to the trial court's assessment of Mr. Watts in deciding a drug test was not warranted, unless "the record provides unmistakable evidence that the trial court's impressions are defective," we defer to the court's conclusion. *Hilton*, 435 A.2d at 388; *see also Anderson*, 881 F.2d at 1142 (observing that "the [trial] court denied defense counsel's request after observing [the witness's] demeanor and

questioning her as to her past and current drug use"). Here, the trial court observed that Mr. Watts was "speaking rather slowly and deliberately" during his direct testimony but noted that Mr. Watts had "suffered significant injuries" and had not "admitted [to] doing anything." The court also considered the irregularities in Mr. Watts's testimony in its assessment, acknowledging that Mr. Watts "sometimes [ ] had difficulty recalling" parts of his testimony and needed his recollection refreshed. Weighing these observations, the court reasonably concluded that there was nothing about Mr. Watts's demeanor or performance on the stand that would compel the court to order a drug test. *See Hilton*, 435 A.2d at 387-88; *Anderson*, 881 F.2d at 1142.

### 2. *H.J.*

Ms. Chandler argues that the trial court's handling of H.J.'s testimony violated her Sixth Amendment right to confrontation or constituted an abuse of discretion.

First, turning to Ms. Chandler's framing of the error as one of constitutional dimension, we will find a Sixth Amendment violation "if 'a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue the proposed line of cross-examination.'" *In re J.W.*, 258 A.3d 195, 202 (D.C. 2021) (citation modified) (quoting *Delaware v. Van Arsdall*, 475 U.S. 672, 680 (1986)).

When the trial court denied her requests for a competency voir dire and subpoena, it simultaneously made clear that Ms. Chandler was free to cross-examine H.J. on her mental conditions, the inconsistencies in her grand-jury testimony (to which Ms. Chandler cited in calling H.J.'s competency into question), her time at the crisis facility, and the impact any mental health or other medical treatment had on her perception. Additionally, the trial court left the door open for Ms. Chandler to renew her subpoena request if she was of the view that cross-examination had proven insufficient to make her case to the jury regarding H.J.'s credibility. Ms. Chandler neither cross-examined H.J. on any of these issues nor re-raised her subpoena request. Because Ms. Chandler was afforded the opportunity to "pursue [her] proposed line of cross-examination" as to H.J.'s competency, credibility, and reliability, we find no error of constitutional magnitude. *In re J.W.*, 258 A.3d at 202-03.

Second, assuming without deciding that the trial court abused its discretion, we conclude that reversal is not warranted because the error was harmless. With respect to non-constitutional error, we will affirm if we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Robinson v. United States*, 50 A.3d 508, 528 (D.C. 2012) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "We take into account factors such as the closeness of

the case [and] the centrality of the issue affected by the error . . . but 'our focus is on the likely impact of the alleged error on the jury's verdict.'" *Id*. (quoting *Settles v. United States*, 615 A.2d 1105, 1109 (D.C. 1992)).

Simply put, stripping H.J.'s testimony from the case entirely would not have changed the result here; in light of other evidence including a contemporary identification of Ms. Chandler by Mr. Watts, other witness testimony, the surveillance video footage, photographs of Mr. Watts's injuries, and Ms. Chandler's own statements during her custodial interview and jail calls, H.J.'s testimony likely had a modest impact on the jury's verdict and even omitting it entirely would not have resulted in a different outcome.

As relevant to the guilty verdicts, H.J.'s testimony established the following facts: (1) the identities of Mr. Watts's assailants; (2) the timing and manner of the assault; and (3) that a gun was used by Mr. Tucker during the assault. H.J. testified that she was present in the apartment the night of the assault and witnessed Ms. Chandler and Mr. Watts argue. She stated that Mr. Watts then "got [Ms. Chandler] out of the apartment," only for Ms. Chandler to then return to the apartment several hours later with her son. H.J. testified that after hearing a knock at the door, she looked through the peephole and saw "[Ms. Chandler] and her son Donnell." According to H.J., Mr. Tucker forced his way into the apartment—followed closely

by Ms. Chandler—and "grabbed [Mr. Watts] from his feet all the way outside in the hallway." She then described a simultaneous beating by the pair, with Ms. Chandler striking Mr. Watts about the head and face with her fists, that concluded when Mr. Tucker shot Mr. Watts "five times in the leg" before he and Ms. Chandler fled.

Evidence apart from H.J.'s testimony establishing these facts includes Ms. Chandler's statements to detectives that (1) she recruited an accomplice to assist her in assaulting Mr. Watts; (2) she participated in the assault by beating Mr. Watts with her fists; and (3) the assault involved a firearm and "pistol-whipping." Mr. Watts's testimony that Ms. Chandler and her son beat and shot him corroborates these statements, as does the surveillance footage from the night of the attack, with audio consistent with this description of the assault and video of two individuals fleeing the apartment building shortly after a gunshot was heard and then doubling back to retrieve a "clip" from the scene of the assault.

Likewise, the photographs and medical records detailing Mr. Watts's injuries provide additional, detailed documentary evidence of the injuries inflicted by the ring Ms. Chandler was wearing during the assault and Mr. Tucker's gun. Finally, the confirmation photo shown to Mr. Watts reinforces the identification of the assailants as Ms. Chandler and Mr. Tucker. Given this independent evidence, we

conclude that H.J.'s testimony did not "substantially influence" the jury's verdict, rendering the trial court's assumed error harmless. *Robinson*, 50 A.3d at 528.

### III. Conclusion

For the foregoing reasons, we reverse Ms. Chandler's conviction for PFCV and affirm her remaining convictions.

*So ordered.*